IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
**F I L E D**

JUN 12 2017

ARTHUR JOHNSTON
BY_____ DEPUTY

UNITED STATES OF AMERICA

VERSUS                                          CRIMINAL NO. 2:16-cr-7-KS-MTP

CHARLES BOLTON and LINDA BOLTON

FILED UNDER SEAL BY ORDER [DOC. 273]

---

**MEMORANDUM IN SUPPORT OF RESPONSE OF JOE SAM OWEN AND OWEN, GALLOWAY & MYERS, P.L.L.C. TO THE MOTION FOR NEW TRIAL [DOC. 175], MOTIONS TO VACATE CONVICTION AND SENTENCE OR FOR A NEW TRIAL [DOCS. 177, 178, 181], AND MOTION FOR RELEASE [DOC. 218]**

---

In accord with the Text Order entered by this Court on June 6, 2017, this single and unified Memorandum in Support of Response is submitted by Joe Sam Owen and Owen, Galloway & Myers, P.L.L.C. to the following motions filed on behalf of Charles and Linda Bolton: the Motion for a New Trial [Doc. 175] filed by Willie J. Huntley and Dennis J. Knizley; the Motions to Vacate Conviction and Sentence or for a New Trial [Doc. 177, 181] filed by Willie J. Huntley and Sharon Henderson, respectively. The Motion for Release [Doc. 218] filed by William C. Walter. The allegations set forth in Doc. 175 are again repeated in Doc. 177, 181 and 218. Doc. 178, a Motion to Vacate Conviction and Sentence or for a New Trial, was filed by Ursula K. Mitchell on behalf of Linda Bolton. Doc. 178 also advances the same John Lee argument set forth in the other motions [Docs. 175, 177, 181, 218]. The Motions to Vacate Conviction and Sentence or

for a New Trial [Docs. 177, 181] filed by different attorneys[1] are mirror images.   It appears that one of the Motions to Vacate [Docs. 177, 181] is a copy and paste of the other motion with identical exhibits.

By Order [Doc. 273] of this Court, the attorney-client privilege and the Work Product Doctrine are waived as to the conflict and ineffective assistance of counsel issues raised in each of the Motions identified herein.   This Memorandum will address the issues raised as to Joe Sam Owen ("Owen") and Owen, Galloway & Myers, P.L.L.C. ("OGM").

## I.      INTRODUCTORY COMMENTS ON FILED MOTIONS

1.      The unprecedented filing of overlapping motions by different counsel [Docs. 175, 177, 181, 218] presents, in large part, redundant arguments shrouded in misleading statements purporting to be fact.   Most of the arguments are generalized, bottomed on a factual basis that is blatantly inaccurate or woefully incomplete.   It is difficult to unravel the meshing of inaccurate factual recitations relied on by Charles Bolton for the claims of conflict and ineffective assistance of counsel.    This Memorandum will address the issues that can be identified with a degree of certainty. The motions generally challenge each and every aspect of the trial preparation, jury selection, the trial, the Presentence Investigation Report, the sentencing, post-sentencing, and the filing of OGM documents under seal.   It is abundantly clear from reading the motions that present counsel have launched an attack on Owen and OGM without regard to the accuracy of the facts alleged and without a full understanding of

---

[1] Sharon Henderson practices in Jackson, Mississippi. Willie Huntley and Dennis Knizley practice in Mobile, Alabama.

the voluminous transactions that formed the ten 26 U.S.C. §7201 and 26 U.S.C. §7206 counts.

The arguments/issues raised in the motions are absolutely frivolous and certain arguments move from the ridiculous to the sublime.  For example, an issue is raised by Charles Bolton concerning a comment made by Owen during the *in camera* sentencing hearing[2] on March 17, 2017, that Bolton "shot himself in the foot because he undid everything I was trying to do.  I take that back.  He blew off both legs, because what he doesn't know, and Fred will tell you, I was constantly advocating for him (Charles Bolton)."  This figure of speech was used by Owen to emphasize the imprudence of Bolton's tirade of attacks against the Government, Owen and OGM at a time when Owen was actively advocating the interest of Charles Bolton.   Counsel for Bolton classifies this figure of speech as a "derogatory statement" with "connotations of violence."  The extreme hyperbole of "connotations of violence" just underscores the baseless arguments advanced in the Charles Bolton motions.

2.    At no time prior to the filing of the subject motions did counsel [Henderson, Huntley, Knizley, Walter] contact or attempt to contact Owen, Galloway,

---

[2] The *in camera* hearing was limited to determining if Charles Bolton wanted Owen or the public defender, Dennis Joiner, to represent his interest during the sentencing hearing.  Charles Bolton's counsel, Willie Huntley, was also present during the *in camera* conference, but Huntley intentionally failed to seek *pro hac* admission claiming he had not been retained, yet he traveled from Mobile, Alabama to Hattiesburg, Mississippi and for what purpose?  Huntley was admitted *pro hac* after the sentencing hearing.  At the time of the sentencing, Charles Bolton had the benefit of other counsel of record.  Robert Udashen of Dallas, Texas and Sam McHard of Hattiesburg, Mississippi were previously admitted as counsel of record.  Neither counsel appeared for the sentencing hearing claiming that their role was limited to the appeal side of the case.  However, McHard later appeared as local counsel for Willie Huntley and Dennis J. Knizley, although McHard has now withdrawn as counsel for Bolton.  Bolton opted to have Owen represent him during the sentencing hearing.  It certainly now appears that this decision was made by Charles Bolton for one reason- to add to the ineffective assistance of counsel list the sentencing hearing.  This certainly is the footprint of a staged performance by Charles Bolton.

or the designated OGM paralegal, Melissa Ballard, to determine the accuracy or truthfulness of the facts surrounding the separate and detached representations of Charles Bolton in the 2014 food theft case and the 2016 tax case. Instead, counsel just drew on statements made by Charles Bolton and Carl Nicholson without regard to the accuracy or truthfulness of the statements. It is apparent that Charles Bolton, or one of his friends, hired lawyers to advance a scripted narrative on his behalf without regard to the truth. This scripted narrative is now embodied in the subject Motions and the Motions are predicated on reckless, misleading, and false statements designed to achieve certain objectives for Charles Bolton, regardless of the means employed to reach the objectives [Docs. 175, 177, 181, 218].

## II.   OMISSION OF IMPORTANT FACTS

1.   Owen and OGM submit that the Motions omit important facts. Below include some, but not all, of the important omitted facts:

A.   The details surrounding the representation of Charles Bolton in the 2014 alleged food theft case premised on a conspiracy charge under 18 U.S.C. §371 to commit one or more offenses under 18 U.S.C. §666 (theft from federally funded programs) and 18 U.S.C. §1342 (mail fraud related to the food theft).

B.   The agreed to fee arrangement for Owen and OGM representing Charles Bolton with reference to the food theft case identified above.

C.   The plea offer in the food theft case in October 2014.

D.   The unrelated tax indictment on March 22, 2016.

E.   The extent of trial preparation by Owen, Ben Galloway ("Galloway") and the OGM staff in contemplation of the tax trial.

F.    The extensive document preparation and the meetings the OGM firm attended attempting to educate five different lawyers on the multiple issues relating to two business operations involved in the tax case.

G.    The facts surrounding the change in the trial strategy OGM worked on and developed from April 2016 to a point approximately ten days before trial.  The change of strategy was with the knowledge, approval and consent of Charles Bolton over the objection of Owen, Galloway and OGM.

H.    The change in strategy imposed on Owen, Galloway and OGM with the consent and approval of Charles Bolton, notwithstanding the failed efforts of Owen and Galloway to convince Charles Bolton that the changed defense was problematic.  The refusal of Linda Bolton to testify destroyed the defense OGM worked on for approximately five (5) months.  This change was discussed with Charles Bolton on many occasions, including the night before jury selection and the night before the Government rested its case.

I.    Charles Bolton's varied explanations surrounding the John Lee checks.

J.    Charles Bolton's inability to explain the deposits marked as loans claiming he had no knowledge of the loan characterization until after the March 2016 Indictment, and that the only person who could explain five years or 120 months of cumulative deposits marked as "loans" was Linda Bolton. This was inconsistent with other information OGM had.

K.    The changed defense strategy left critical issues unexplained and only Linda Bolton could have explained those issues. Charles Bolton refused to support the position of Owen and Galloway on the change in defense.  In effect, Charles Bolton controlled the defense of his case and it is now clear he was consulting with and following the advice of Carl Nicholson, Bud Holmes, John Chain and possibly others.

## III.    CONFLICT ISSUE AS TO JOHN LEE - *GARCIA* HEARING

1.    A district court need only conduct a *Garcia* hearing if there is an actual conflict of interest.  *United States v. Carpenter*, 769 F.2d 258 (5th Cir. 1985).  A defendant

5

must show more than a speculative and unsupported conflict.  *United States v. Infante*, 404 F.3d 376 (5th Cir. 2005).  A conflict of interest cannot be manufactured or scripted for the purpose of seeking a *Garcia* hearing.  Moreover, to seek a *Garcia* hearing two years later on a fee paid in November 2014 on an unrelated case is the hallmark of questionable conduct on the part of Charles Bolton.  In *United States v. Garcia-Jasso*, 472 F.3d 239 (5th Cir. 2006), the Court held that a Defendant must show more than a speculative or potential conflict of interest; it must be demonstrated that the attorney made a choice between possible alternative courses of action, and if he did not, then the conflict remained hypothetical.  A *Garcia* hearing contemplates an upfront hearing designed to inform a defendant of his rights when a conflict is at issue.  Now, almost two and half years later, Charles Bolton claims he experienced an epiphany and decided either before or immediately after the tax conviction in September 2016 that the fee he paid Owen in 2014 for the food theft case created a conflict in 2016 on the Title 26 tax case.

2.     In *United States v. Hernandez*, Hernandez failed to establish that the attorney, Gonzales, labored under a non-hypothetical conflict of interest.  The Court concluded "'that the district court did not err in failing to conduct a *Garcia* hearing'…[the] attorney did not have an actual conflict of interest because appellant's claims "rely on speculation and inferences that are unsupported by the record.'" 690 F.3d 613, 620 (5th Cir. 2012) (citing *Garcia–Jasso* 472 F.3d at 245).

3.     The factual basis for the alleged conflict of issue here was retrofitted by Charles Bolton, and implemented through the motion filings by his present attorneys.

The allegations of the Motions represent a misleading account of the money Charles Bolton borrowed, or claimed he borrowed, to pay the retainer fee to Owen and OGM in the food theft case in November 2014.

4.      Charles Bolton has inundated this Court with overlapping motions by different lawyers with allegations that serve only one purpose -- to damage and harm Owen, Galloway and OGM.  The John Lee conflict story heads the list of approximately forty-five (45) issues raised by Charles Bolton in the various filed motions.  It also conveniently serves the purpose of facilitating the separate civil lawsuits recently filed by Charles and Linda Bolton against the accounting firm of Topp McWhorter Harvey, PLLC and John Lee.  One could speculate with a degree of accuracy that Nicholson is assisting Charles and Linda Bolton in the civil lawsuits.  It also appears that the feigned conflict of interest claim was conjured up at some point well in advance of the original sentencing date in December 2016, and possibly before the September 2016 trial ever began.

## IV.   JOHN LEE CONFLICT ISSUE WAS PART OF THE COOPERATION PLOY

1.      The manufactured conflict issue also served to facilitate a ploy by Charles Bolton during the December 2016 to March 2017 time frame beginning on December 19, 2016, when Charles Bolton instructed Owen and Galloway to seek a continuance of the December 19, 2016 sentencing hearing claiming that he and John Chain, a close friend and financier[3] of Charles Bolton, were prepared to cooperate with the Government and,

---

[3] According to Charles Bolton, Chain was paying all or part of the fee for Robert Udashen, a Dallas, Texas attorney.

according to Charles Bolton, provide significant information of criminal activity[4].  This new found spirit of cooperation on the day of sentencing is quite telling because Charles Bolton and John Chain had ample opportunity to come forward months earlier. Instead, they waited from September 2016 to December 19, 2016, within an hour before the sentencing hearing would begin.  The ploy is now quite evident—in the event Charles Bolton's alleged cooperation with the Government failed to materialize and Charles Bolton was forced to appear for sentencing, he would avail himself of the fabricated conflict claim.   Conversely, if the Government continued to agree to a resetting of the sentencing, Charles Bolton would "hold back" the claimed conflict, just as Charles Bolton held back the affidavit[5] of Carl Nicholson signed on January 20, 2017, two days after the January 18, 2017 sentencing was continued and shortly before the reset sentencing hearing on February 3, 2017, which was also continued.  The conflict card was played on March 9, 2017[6], shortly before the sentencing hearing on March 17, 2017.   Surely, John Chain was made aware of Charles Bolton's intent since Chain,

---

[4] Charles Bolton's desire to cooperate occurred on December 19, 2016, while waiting for the conclusion of the Fairley sentencing hearing.  Charles Bolton and John Chain approached Owen and Galloway in the office of John Chain and instructed Owen to seek a continuance of the sentencing so that he (they) could begin the alleged cooperation.  Was it a scheme to continue the sentencing, and if not why was this cooperation not offered months earlier after the September 2016 conviction?

[5] It remains unanswered who prepared the affidavit for Carl Nicholson that was signed on January 20, 2017. Obviously, Charles Bolton and Nicholson consulted and planned out the signing of the affidavit well in advance of January 20, 2017.

[6] On March 9, 2017 Willie Huntley contacted Fred Harper, the AUSA in charge of the subject tax case, and requested that the March 17, 2017 sentencing hearing be continued because "Joe Sam Owen had a conflict." Three days earlier, Owen was in contact with Harper and the agent trying to lobby for a continuance at the request of Charles Bolton.  Charles Bolton also directed Owen to negotiate for probation/home confinement.  Charles Bolton requested that Owen continue to push for a continuance of the March 17, 2017 sentencing hearing.  Not a word was uttered by Charles Bolton about a conflict.  The AUSA, Fred Harper, rejected multiple requests by Owen for a continuance.  Once it became apparent to Charles Bolton that the sentencing hearing would take place, Charles Bolton decided the time was ripe to play the conflict card and it started with the phone call from Huntley to AUSA Fred Harper.  Owen did not know Huntley and had no knowledge of Huntley's involvement until March 9, 2017.

according to Charles Bolton, was paying the fee of the only other attorney who has filed an entry of appearance for Charles Bolton after the conviction in September 2016 and before the sentencing hearing in March 2017.

2.      In January, February and early March of 2017, Owen was in constant dialogue with Charles Bolton about his cooperation. The AUSA, Fred Harper, was steadfast in his position that Charles Bolton was not providing significant assistance to the Government and that Charles Bolton was not operating in good faith.  Once AUSA Harper made the final decision to move forward with the March 17, 2017 sentencing, Charles Bolton requested Owen to continue his efforts to seek another continuance and to convince Fred Harper that he (Bolton) was cooperating.  See series of texts between Owen and Charles Bolton covering the period from March 3, 2017 through March 6, 2017, *in globo* **Exhibit 1**.  It is important to note from Exhibit 1 Charles Bolton's specific reference about the need to update his Texas lawyer (Robert Udashen practices in Dallas, Texas) as to the status of his sentencing, when in fact Robert Udashen was not even involved in the trial level matters; unknown to Owen, it was Willie Huntley from Mobile, Alabama.  Charles Bolton blatantly misled Owen and three days later[7] [after the March 3 - March 6 text exchanges between Owen and Bolton] Willie Huntley surfaces for the first time via a telephone call to Fred Harper requesting a continuance of the sentencing. Willie Huntley enters the loop seeking a continuance of the March 17, 2017

---

[7] From the continued December sentencing hearing, Owen continued to monitor Charles Bolton through text messages and/or telephone conversations with Charles Bolton.  There was not a single word uttered about a conflict and Bolton gave no indication about the complaints he now lodges.  Obviously, concealment from Owen was important to Bolton so Owen would continue to work on a satisfactory sentencing recommendation from the Government.

sentencing hearing, for an entirely different reason: the alleged Owen conflict.   The above chronology conclusively establishes that Charles Bolton was deceiving Owen and OGM during the entire alleged cooperation period.   Charles Bolton and Huntley had, prior to March 9, 2017, decided on the fallback plan for Huntley to call Fred Harper if Owen was unable to obtain a continuance of the March sentencing.   Amazingly, Charles Bolton told this Court during the *in camera* sentencing hearing on March 17, 2017, that he had no idea Huntley called Fred Harper and that he "wasn't involved in that" and "didn't know about the conversation."   Tr. In-Chambers, pp.6, 7.   If Charles Bolton was not involved, why is Huntley calling Fred Harper three days later about an alleged John Lee conflict.   We also know that two months earlier in January 2017 Charles Bolton and Carl Nicholson are working on the Nicholson affidavit.

3.     The predominant argument advanced in the motions is that John Lee hired Owen and OGM to defend the tax indictment.   At no time did John Lee hire or retain Owen, Galloway or the firm of OGM to represent or defend Charles Bolton in any case, criminal or civil.

## V.     HISTORY OF THE 2014 FOOD THEFT CASE – GOVERNMENT CLAIMED A 18 U.S.C. §371, §666, §1342 VIOLATION- BOLTON'S FEE STRUCTURE FOR THE 2014 FOOD THEFT CASE

1.     In order for this Court to have a complete understanding of the John Lee issue, it necessary to provide the historical background. During the months of August and September 2014, Owen was contacted by Terrell Bolton, the brother of Charles Bolton, as well as Charles Bolton, concerning representation of Charles Bolton in an investigation by the Department of Justice and the auditor of the state of Mississippi

10

relating to the alleged theft of food ("food theft case") from the Forrest County Sheriff's Office/Adult and Youth Detention Centers. See attached phone log of Joe Sam Owen for August 28, 2014 and September 18, 2014, **Exhibit 2** [the logs are redacted to protect the privilege and privacy of other clients or prospective clients not involved in the subject case].

       2.      On September 3, 2014, the undersigned conferenced with Charles Bolton in the office of OGM. Owen does not recall if Terrell Bolton, the brother of Charles Bolton, was present for the September 3, 2014 meeting, but there were several meetings in the office of OGM at a point in time with Charles and Terrell Bolton present. At a time in September 2014, Owen agreed to represent the interest of Charles Bolton in the food theft case and advised Charles Bolton that he would advise him as to the fee structure.

       3.      On or about October 22, 2014, Charles Bolton informed Owen about a non-specific scheduled meeting with Assistant United States Attorney, Michael Hurst ("AUSA") in Hattiesburg, Mississippi, to discuss the food theft case. Charles Bolton directed Owen to contact James Dukes for more specifics about the meeting. Owen was uncertain about James Dukes' involvement. See phone log of Joe Sam Owen for October 22, 2014. **Exhibit 3** [the log is redacted to protect the privilege and privacy of others not involved in the subject case].

       4.      On October 23, 2014, the undersigned sent an email to James Dukes inquiring about the meeting with the AUSA. By an email response, James Dukes verified that Charles Bolton and Linda Bolton were targets of a food theft case relating to the Forrest

County Jail and a restaurant owned by Charles and Linda Bolton. See copy of an email transmission to James Dukes from the undersigned dated October 23, 2014, **Exhibit 4**. A review of the attached email string confirms a meeting scheduled for October 27, 2014, in the United States Courthouse in Hattiesburg.

5.    Also, on October 23, 2014, Owen sent an email to Charles Bolton concerning the fixed fee for representing the interest of Charles Bolton on the food theft case. The fee structure was the payment of a fixed retainer fee of $75,000.00, and if an indictment was returned against Charles Bolton and the food theft case proceeded to an actual trial, an additional sum of $50,000.00 would be paid for a total fixed fee of $125,000.00. If the food theft indictment did not result in a trial, Charles Bolton would advance an additional payment of $10,000.00 for a total fee of $85,000.00. Otherwise, the fee was fixed at $75,000.00 to represent his interest in the alleged food theft case. The fee structure was fixed and not tied to an hourly rate. See copy of email transmission to Charles Bolton dated October 23, 2014, attached as **Exhibit 5.** Charles Bolton knew it was a fixed fee and agreed to such an arrangement for representing his interest in the food theft case. It was at some unknown point in 2016 that Charles Bolton, reaching for the last straw, fabricated his new theory of a conflict.

6.    On October 27, 2014, Owen and an OGM associate attended the meeting on the first floor conference room of the United States Courthouse in Hattiesburg. Mike Hurst, the assigned AUSA, was present with several agents from the Federal Bureau of Investigation and the state Auditor's office. James Dukes, Bud Holmes, John Colette,

and an associate from the office of James Dukes also attended.  The role of Bud Holmes was unknown.

7.      The AUSA, Mike Hurst, presented an abbreviated, but fairly detailed version of the facts supporting the Government's claim that Charles and Linda Bolton, and certain jail employees, who we determined later was Allen Harralson and Jerry Woodland, had, for a protracted period of time, engaged in a profitable scheme to steal food from the Forrest County Sheriff's Office/Adult and Youth Detention Centers. According to the AUSA, different methods were employed by Charles and Linda Bolton to allegedly steal food for the benefit of their restaurant, Sports 22.  According to the AUSA, one of the methods used by Charles and Linda Bolton was that Charles Bolton would cause certain of the stolen food to be delivered from the detention facility to his off-premise catering business with Manheim.  The AUSA claimed that the financial loss to Forrest County as a result of the alleged food theft was significant and that Charles Bolton, as the Chief Deputy, was the supervisory leader of the alleged food theft ring.  At the time of the subject meeting, the undersigned was not familiar with Sports 22 and had never been to the location of Sports 22.

8.      The food theft case had zero connection to John Lee.  John Lee was not the subject of or a target in the food theft case and he was not involved as a witness.  It was beyond any reasonable doubt that Charles, as the Chief Deputy of the Forrest County Sheriff's Department, and Linda Bolton, as the primary operator of Sports 22, were the targets.  The Government claimed confidence in its position that over a period of years Charles and Linda Bolton allegedly stole or illegally removed from the Detention

Facility food products purchased and paid for by Forrest County.  This is confirmed by the Presentence Investigation Report on Charles Bolton outlining the alleged scheme to steal food covering a period of approximately ten (10) years.

9.       On the same day, October 27, 2014, the AUSA, Mike Hurst, authored a letter addressed to James Dukes, John Colette, and Owen seeking clarification as to who was representing Charles Bolton.  Mike Hurst also opined that James Dukes had a conflict since he also represented the victim, Forrest County Sheriff's Department.  See copy of an email transmission letter from AUSA Michael Hurst dated October 27, 2014, **Exhibit 6.**

10.       At a point after the October 23, 2014 email to Charles Bolton concerning the fee structure, Charles Bolton advised Owen that he did not have the funds immediately available to tender the retainer fee, but he would make arrangements to obtain the retainer fee.  Owen had no information about the financial standing of Charles Bolton, other than the information about alleged mortgages on his home and the commercial building.

11.       On Monday, November 3, 2014, Charles Bolton telephonically contacted Owen and advised that he had made arrangements for the retainer fee.  A meeting in the office of OGM was scheduled for November 5, 2014.  See phone log of Joe Sam Owen for November 3, 2014, **Exhibit 7** [the log is redacted to protect the privilege and privacy of others not involved in the subject case].

12.       On November 5, 2014, Charles Bolton met with Owen in the offices of OGM.  The meeting was scheduled for 4:15 p.m.  Charles Bolton was not accompanied

by any other person.  See calendar of Joe Sam Owen/OGM for November 5, 2014, attached as **Exhibit 8** [the calendar is redacted to protect the privilege and privacy of others not involved in the subject case].

13.     During the November 5, 2014, meeting in the office of OGM, Charles Bolton presented to Owen three checks.  One was an official check from John Lee in the amount of $25,000.00 and dated November 5, 2014; one was from the account of Carl Nicholson in the amount of $25,000.00 dated November 3, 2014, and one was from Southern Neurologic & Spinal Institute in the amount of $10,000.00 and dated October 31, 2014.  Bolton represented to Owen that he obtained loans from friends and had the checks made payable to Owen, but he was unable to obtain the full $75,000.00 payment.  Charles Bolton advised that he would make arrangements to obtain the additional $15,000.00 payment in due course.  See checks *in globo* **Exhibit 9**.  See OGM bookkeeping printout **Exhibit 10**.

14.     The undersigned knew John Lee, but only in a professional capacity as counsel opposite in a domestic relations case approximately twelve years earlier.  Owen has never entered the office of John Lee, has never visited in his home, and in 2014 knew nothing about his relationship with Charles Bolton, other than the comment made by Bolton that they were friends.  The same holds true for Carl Nicholson.  Owen does not recall ever being introduced to Carl Nicholson before Charles Bolton presented Owen with the Nicholson check.  Owen had no relationship with Carl Nicholson and Owen never talked to Carl Nicholson about Charles Bolton during the relevant 2014 time period and has never visited in his home.

15

15.     Galloway, a member partner in OGM, met Charles Bolton in November 2014. Charles Bolton introduced himself to Galloway.  Galloway was aware of the fee Charles Bolton paid to Owen and OGM in November 2014 on the food theft case.  See the affidavit of Ben Galloway, **Exhibit 11.**

16.     On November 18, 2014, Owen traveled to Jackson, Mississippi, to meet with the United States Attorney for the Southern District, Greg Davis, AUSA Carla Clark, and AUSA Mike Hurst to discuss the food theft case.  The purpose of the meeting was to argue the position of Charles Bolton with the objective of convincing the United States Attorney's office not to move forward with an indictment.  See calendar of Joe Sam Owen/OGM for November 18, 2014, **Exhibit 12** [the calendar is redacted to protect the privilege and privacy of others not involved in the subject case].

17.     At no time prior to November 5, 2014, or after the delivery of the checks by Charles Bolton to Owen on November 5, 2014, did Owen, Galloway, or any member of the OGM firm meet with, converse with or have any contact with John Lee concerning the money Charles Bolton borrowed from John Lee or about the food theft case. The same holds true for Carl Nicholson and Southern Neurologic & Spinal Institute.

18.     Owen and Galloway have recently read the affidavit of Carl Nicholson in which Nicholson claims money was given to him by John Lee to advance to Charles Bolton under the name of Carl Nicholson.  The undersigned had no knowledge of the alleged transaction until Owen and Galloway read the affidavit of Nicholson.  There is a strong possibility that if such occurred, it was another Carl Nicholson maneuver to

16

obtain a tax benefit for John Lee by writing off the loan to Charles Bolton as a deductible accountant expense payment from John Lee to his accountant, Carl Nicholson.

19.    The case of *United States v. Olivares*, 786 F.2d 659 (5th Cir. 1986) is instructive on the actual conflict issue.  The *Olivares* case is factually different from the subject case because this case involves borrowed money by Charles Bolton to pay a fee on a totally unrelated case.  In *Olivares*, the Fifth Circuit held that defense counsel's prior representation of a prosecution witness who was had paid part of defendants' attorney fees did not amount to "active representation of conflicting interests" by defense counsel, even if defense counsel was operating under actual conflict of interest. The record indicated that the assumed conflict did not adversely affect his performance.

20.    In the subject case, neither John Lee nor Carl Nicholson paid Owen to represent Bolton in the food theft case or the tax case; Owen never represented John Lee or Carl Nicholson in any matter; neither John Lee nor Carl Nicholson was a co-defendant in the tax case indictment; neither John Lee nor Carl Nicholson was a witness for the Government in the tax case, and neither John Lee nor Carl Nicholson was a subject or target in the food theft case two years earlier.

## VI.    TITLE 26 [TAX] INDICTMENT - MARCH 2016

1.    The first time Owen became aware of the tax indictment, or a tax investigation, was via a phone call from Special Agent Bradley Luker on March 23, 2016.  The undersigned first inquired if the Indictment was the alleged food theft case and Agent Luker advised that it was an entirely new matter, a tax indictment.    See

phone log of Joe Sam Owen for March 23, 2016, **Exhibit 13** [the phone log is redacted to protect the privilege and privacy of others not involved in the subject case].

2.     Agent Luker advised that Charles Bolton was a defendant in an ongoing civil trial before this Court relating to the Hattiesburg mayoral race and a claim by a former female employee of the Forrest County Sheriff Department alleging improprieties on the part of Charles Bolton. Owen was not aware that the civil trial was in progress. Agent Luker advised that an initial appearance and arraignment date would need to be scheduled in short order. Neither Owen nor Charles Bolton had any knowledge of a tax investigation, much less a pending tax indictment. Charles Bolton admitted to this Court during the sentencing hearing on March 17, 2017, that he had no knowledge of a tax investigation or the indictment until March of 2016.

## VII.   FEE ARRANGEMENT - FOOD THEFT CASE IN 2014; TAX CASE IN 2016- BOLTON IS NO STRANGER TO BORROWING MONEY TO PAY ATTORNEYS

1.     Charles Bolton and Owen/OGM did not execute a written employment contract for the 2014 alleged food theft case or the 2016 tax indictment. The $60,000.00 fee paid in November 2014 to Joe Sam Owen/OGM on the food theft case was not and is not the property of Charles Bolton, Linda Bolton or the individuals who loaned monies to Charles Bolton. It was and is the property of OGM. Although promises were made in 2014 by Charles Bolton to pay the additional $15,000.00 fee, he never did.

2.     Owen and OGM submit that the spin by Charles Bolton on the attorney fee payment received for the food theft case, now the basis for the conflict argument in the tax case, is the embodiment of intellectual dishonesty.

18

3.     The tax indictment case was wholly unrelated to the §371, §666, and §1342 potential charges in the food theft case.  On the tax case, Owen agreed to a payment of $65,000.00 which was a reduced fee extending to Charles Bolton the gratuitous benefit of a credit on the fees paid to Owen/OGM on the food theft case.  Owen agreed to the same total fee payment set forth in the food theft case and by allowing credit to Charles Bolton, which Owen and OGM were not obligated to do, Charles Bolton would owe $65,000.00 plus expenses for the tax case.  From April 2016 to date, Charles Bolton paid a total sum of $35,000.00 on the tax case, but failed to pay the balance of $30,000.00 in attorney fees, and failed to pay any part of the litigation expenses currently totaling approximately $38,000.00. The net financial effect was Owen, Galloway, and OGM represented Charles Bolton on two separate and distinct criminal matters and the net attorney fees earned by OGM over the entire two year period for the two cases involving two, and sometimes three OGM lawyers, as well an OGM paralegal and other staff, is approximately $59,000.00.   As to the tax case itself, OGM has suffered a loss considering the resources expended.  The expenses exceed the amount paid by Charles Bolton on the tax case.  **Moreover, the $60,000.00 paid by Charles Bolton in November of 2014 for the defense of the food theft case occurred before the tax fraud investigation was even initiated in March of 2015.[8]**

4.     It begs the question:  if Charles Bolton was so financially strapped that he could not honor his promise to pay to Owen/OGM the balance due on the food theft

---

[8] Special Agent Bradley Luker testified during the Bolton trial that the tax investigation began in March 2015.  AUSA Michael Hurst handled the food theft case and Louisiana AUSA Fred Harper handled the subject tax case.  Fred Harper had no involvement in the 2014 food theft case.

case in 2014 or the balance due on the tax indictment case in 2016, how was Charles Bolton financially[9] able to retain the carousel of lawyers for himself and Linda Bolton in this case?

| | | |
|---|---|---|
| **Bud Holmes** | **Robert Udashen** | **Sharon D. Henderson** |
| **James Dukes** | **Samuel S. McHard** | **Ursula Mitchell** |
| **Lisa Ross** | **Willie J. Huntley** | **Matthew Robinson** |
| **Carlos Tanner** | **Dennis James Knizley** | **Jeffrey M. Brandt** |
| **Robert McDuff** | **Margaret W. Holmes** | |
| **William C. Walter** | **Mary Holmes** | |

5.       The point is this - the retainer fee payment to Owen and OGM for the food theft case in 2014 was probably not the last time Charles Bolton borrowed money, or was given money from a friend to pay attorney fees.

## VIII.  PLEA OFFER - ONE COUNT INFORMATION ON THE 2014 FOOD THEFT CASE- A POTENTIAL SERIOUS FELONY

1.       In October 2014, Charles Bolton was offered a plea arrangement to a one count Information on the alleged theft of food from the Forrest County Detention facility.  The Information was received by Owen via an email from AUSA Mike Hurst on October 29, 2014, and submitted to Charles Bolton. A plea agreement was also tendered.  The proposed plea was to a §371 conspiracy to violate §666 (theft of food from Forrest County) and §1342 (mail fraud in furtherance of the food theft).  As part of the Plea Agreement, **Linda Bolton would not be prosecuted**.

---

[9] Did Charles Bolton borrow money directly from an individual, or was it a gift to him or did he obtain a loan with "friends" as personal guarantors?  According to the financial part of the PIR, Charles Bolton could not borrow the funds necessary to pay his battalion of lawyers without substantial guarantors.  His net worth as of the date of the PIR was $27,698.00 and his total monthly cash flow is $985.00.

2.     The undersigned did not represent Linda Bolton, so it is unknown if the letter from Mike Hurst and the Plea Agreement not to prosecute Linda was ever communicated to Linda.  One would think, and certainly hope, that Charles Bolton did communicate to Linda Bolton, his wife, the opportunity for her to walk free.  See email from Mike Hurst, the proposed Information and Plea Agreement *in globo* **Exhibit 14**. Although there was an offer of cooperation, a possible 5k.1 U.S.S.G. downward departure for Charles Bolton and no prosecution as to Linda Bolton, Owen was instructed by Charles Bolton to reject the offer and Owen followed the directive.  See email from the undersigned to Michael Hurst dated January 9, 2015, **Exhibit 15**.

3.     The food theft case was an entirely different criminal investigation involving different time periods, different alleged federal violations, different victims, different witnesses, different prosecutors and different evidence.  The 2014 food theft case involved the alleged theft of food from a county department and the 2016 tax case involved the personal tax returns [1040] of Charles and Linda Bolton.

## IX.   BLANKET ASSERTION OF A CONFLICT AND THE SELF SERVING ARGUMENTS THAT THE PERFORMANCE OF JOE SAM OWEN/BEN GALLOWAY AND OGM WAS INTENTIONALLY INEFFECTIVE

1.     The blanket assertion that there was a conflict of interest is meritless and the claim that the alleged conflict compromised or impacted the performance of counsel is absurd.  Moreover, the staging of facts to manufacture a conflict is apparent from reading the various motions.  No conflict ever existed in either the food theft case or the tax case, so the skewed narrative, the staging of facts and in some instances the outright fabrication of facts merit no response beyond the response provided herein.  Owen has

21

never had a conflict with John Lee and Charles Bolton and neither has Galloway or

OGM. See affidavit of Melissa Ballard, **Exhibit 16**.

**X.   THE FABRICATED CONFLICT ARGUMENT IS THE BASIS FOR THE ARGUMENT THAT CARL NICHOLSON AND PHIL HULL SHOULD HAVE BEEN CALLED AS WITNESSES- SUBPOENA SHOULD HAVE BEEN ISSUED TO JOHN LEE TO FORCE HIM TO ASSERT THE 5TH AMENDMENT IN THE PRESENCE OF THE JURY**

1.      Carl Nicholson, contrary to his affidavit attestations, was at the time of the

trial the subject of a federal investigation.   Carl Nicholson proclaims that he cannot

understand why he would need to retain counsel.   By his own admission, Carl

Nicholson was represented by counsel and invoked the Fifth Amendment when called

before a Grand Jury investigating John Lee[10].   A person does not invoke the Fifth

Amendment unless he, or his attorney, perceives a risk of criminal exposure.

2.      An informed attorney would not level such a ridiculous charge in a

motion that Owen was deficient in his performance because he failed to call as a witness

a person who may be considered by the Government as a possible co-conspirator and

who would be subjected to grueling cross examination.   An informed attorney would

also know that Carl Nicholson was the facilitator of the tax indictment charges against

Charles Bolton for the years 2009 thru 2013.   Further, an informed attorney would also

know that Carl Nicholson was the accountant for John Lee.   Moreover, an informed

attorney would also know that Carl Nicholson was interviewed[11] by Special Agents

with the IRS-CID about his specific accounting service to Charles and Linda Bolton as

---

[10] Nicholson claims there was no connection between the 2016 John Lee Grand Jury investigation and the 2016 Charles Bolton tax case.  One can only assume that Carl Nicholson is in a state of denial.

[11] Nicholson essentially denied any real knowledge of the accounting activities of Sports 22 and Hall Avenue.

well as preparation of their returns over a period of years. If Nicholson had relevant information about John Lee, including the statement John Lee allegedly made to Carl Nicholson as set forth in his affidavit, Nicholson had months and multiple opportunities to share that information with the IRS and the AUSA, Fred Harper. The perfect time for Nicholson to provide the information about John Lee was to the Grand Jury investigating John Lee. Instead, Carl Nicholson invoked the Fifth Amendment. To now claim he would not have invoked the right against self-incrimination in the Charles Bolton trial is beyond belief. There were other secondary factors that play into a decision to call Carl Nicholson, such as credibility, reputation in the community and any prior arrest/convictions, including any arrests where Nicholson may have attempted to invoke the aid of Charles Bolton as Chief Deputy.

3.    It would have been imprudent to call Nicholson as a witness in the Bolton trial. Aside from the very important fact Nicholson would have invoked protection from self–incrimination under the Fifth Amendment[12], Nicholson would have encountered damaging cross examination on several issues. For example, if Nicholson attempted to testify at trial to specific accounting issues germane to the indictment contrary to a previous statement he gave to the Special Agents, Nicholson's credibility would have been seriously damaged. Previously, Nicholson buried his head in the sand when he told the agents during an interview that he could not recall ever having

---

[12] At the time of the trial, Nicholson was represented by Frank Trapp. There is no doubt Mr. Trapp would have strongly advised against Nicholson testifying. Upon information, Mr. Trapp has withdrawn as Nicholson's counsel.

conversations with Charles Bolton regarding either Sports 22 or Hall Avenue[13] other than Charles Bolton telling him he was "**losing his _____** "(expletive omitted). Nicholson told the agents that other than some knowledge that Charles Bolton "**may occasionally acquire loans for the business, he has no other involvement in the businesses.**" Nicholson also told the agents that Sports 22 and Hall Avenue package store was a way to give Linda Bolton "**something to do.**"  To the contrary, Nicholson actively participated in assisting Linda over a several year period of time in successfully obtaining the Small Business Administration Section 8(a) certification[14] for Sports 22 that would have been a very profitable enterprise.  Moreover, Nicholson also worked on the annual Section 8(a) audits for several years.  The Government would have destroyed the credibility, if any was still remaining, of Carl Nicholson. Clearly, Nicholson may have exposed himself to a possible 18 U.S.C. §1001 violation (**making a materially false, fictitious, or fraudulent statement in any matter within the jurisdiction of any department or agency of United States, i.e. the IRS).** More importantly, Nicholson may have also subjected himself to criminal exposure under Title 26 because he was identified as the third party designee and the preparer of the tax returns for Charles/Linda Bolton.  Surely, Carl Nicolson, a CPA, was mindful of 26 U.S.C. §7206(2) (aiding, assisting, or counseling in the preparation or presentation of a false or fraudulent tax return) and his possible exposure.  This exposure, standing alone, would have militated against Carl Nicholson testifying.

---

[13] By this statement, Nicholson disavowed any knowledge of the business and accounting operations of Sports 22 and Hall Avenue, yet he claims he was prepared to testify.

[14] The U.S. Small Business Administration Section 8(a) Business Development Program is a business assistance program for small, disadvantage businesses.

4.      Phil Hull ("Hull") was not hired or retained by Owen, OGM, or Charles Bolton.   During a meeting[15] at the office of James Dukes, Owen, Galloway, and the OGM paralegal, Melissa Ballard, were advised in the presence of Phil Hull ("Hull") that he was hired by James Dukes and Bud Holmes as a consultant on behalf of Linda Bolton.   James Dukes and Bud Holmes handed two checks to Hull during the conference in the office of James Dukes, presumably for professional services.

5.      Owen did share detailed information with Hull and Owen discussed with Hull for a number of hours in the presence of Charles and Linda Bolton, James Dukes, Bud Holmes, Galloway and Melissa Ballard the various spreadsheets/summaries prepared by the Government and OGM, the claims asserted by the Government and the potential problems Charles and Linda may encounter defending the ten (10) count indictment.

6.      Hull made it clear that he could not testify about accounting issues or accounting methodology and would be unable to explain away the multiple sources of income marked as loans by Linda Bolton.   Hull also advised that he could not offer accounting expert opinions about the John Lee checks, the Manheim deposited checks, the National Guard deposited checks, the First Data and the First American deposited checks, the contributions to capital, nor could he offer any opinion about the accounting methods of the former Nicholson & Co.   Hull, Owen, and Galloway agreed that the case

---

[15] The meeting occurred during the period of late June-early July 2016 before James Dukes and Bud Holmes were disqualified.   Owen and Galloway expressed concern about Bud Holmes representing Linda.   According to Bolton, he had no choice because Bud Holmes had been "good to him."   The Government did produce a $10,000.00 check from Holmes to Bolton's package store, Hall Avenue, dated December 18, 2013, with no explanation.   The next day, on December 19, 2013, there was a $22,000.00 deposit to the account of Hall Avenue which included the Bud Holmes check, but Bolton again offered no viable explanation as to the source of the other $12,000.00 deposit.

did not lend itself to expert testimony and that Linda and Charles Bolton were the only individuals who could explain their actions over the five year period.   Owen and Galloway have read the affidavit of Phil Hull.  Although the purpose of the affidavit is unclear, Owen submits that Phil Hull knew the problems Charles and Linda would encounter, he could not address.   This is confirmed in an email from Phil Hull on September 19, 2016, to Owen and members of the OGM firm after the tax trial and verdict.   The email from Phil Hull is totally inconsistent with his affidavit.  See email from Hull **Exhibit 17.**

7.     An informed attorney would know the high risk of using such testimony. Of course, this presupposes Hull was *Daubert* qualified to testify as an expert because the cross examination of Hull would not have been limited to the protocol for developing and prosecuting a tax case under the Department of Justice guidelines. Moreover, the proposed opinion by Hull to the effect that the Government did not establish its case beyond a reasonable doubt because the element of willfulness was absent would not have been admitted.   Even if the court allowed such an opinion, the cross examination of Hull into the accounting or bookkeeping methods employed by Sports 22 and Hall Avenue Package would have been problematic.   Further, a summary witness, as Charles Bolton now classifies Hull, must be qualified to offer summary type expert opinions under *Daubert v. Merrell Dow Pharmaceuticals Inc.,* 509 U.S. 579 (1993). Fed. R. Evid. 702 and the teachings of *Daubert v. Merrell Dow,* apply in a federal criminal trial and the Court is required to conduct the *Daubert* gate-keeping analysis.

8.    The John Lee argument advanced by Charles Bolton is simply wrong. John Lee invoked his right under the Fifth Amendment well in advance of the trial and Charles Bolton knew that John Lee would invoke the Fifth Amendment.  It was no surprise.  Charles Bolton sent an email to Joe Sam Owen dated August 23, 2016, with an article that John Lee would seek protection under the Fifth Amendment.  See **Exhibit 18**. Charles Bolton's implication to this Court during his sentencing that he did not know John Lee planned to invoke the Fifth Amendment is a risky matter while under oath. Owen continued to warn Charles Bolton while standing next to him at the podium to exercise caution when making a statement to this court under oath.  Shockingly, Charles Bolton also told the court that he had met with John Lee the day before his trial. Charles Bolton repeatedly told Owen, Galloway and Melissa Ballard that he had no contact with John Lee.  If John Lee was a cooperating witness for the Government, then why did Lee invoke the Fifth Amendment and why did Lee move to quash the trial subpoena issued by the Government?  This is simply another red herring argument by Charles Bolton.

More importantly, the Government previously filed a motion to prohibit the defense from commenting on the unavailability of John Lee and coupled within that Motion was the Government's notice of intent to use certain business records of John Lee P.A. as an exception to the hearsay rule because John Lee had advised through his attorney that he would invoke the protections of the Fifth Amendment and was thus unavailable under the rule.  The Government also issued a trial subpoena to John Lee and John Lee sought to quash the subpoena.  Charles Bolton responded to the Motion

27

and the court conducted an *in camera* hearing.[16]  The Court was advised that John Lee

would invoke the Fifth Amendment and John Lee was excused from appearing because

of alleged health issues[17] and his scheduled appointment at UAB.  However, the Court

allowed counsel during the trial to repeatedly advise the jury that John Lee had invoked

protection under the Fifth Amendment and would not testify.  Notwithstanding the

ruling, Charles Bolton claims that John Lee should have been called to the stand for the

sole purpose of invoking the Fifth Amendment before the jury.  Such a tactic would be

in direct violation of the Court's ruling that John Lee did not have to appear and to

willfully disregard a ruling of this Court, as Charles Bolton and his attorneys suggest,

could result in sanctions.  Moreover, the tactic of calling John Lee to the stand just to

invoke the Fifth Amendment is contrary to well-established Fifth Circuit law.  *See*

*United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978) (rule prohibiting government from

calling witness it knows will assert Fifth Amendment applies equally to defense when

it calls witnesses other than the defendant); *United States v. Lyons*, 703 F.2d 815 (5th Cir.

1983) (defendant has no right to call witness to the stand merely to enforce invocation of

that right before the jury); *United States v. Lacouture*, 495 F.2d 1237 (5th Cir. 1974)

(defense counsel was properly prevented from calling the owner as a witness in jury's

presence).

---

[16] Charles Bolton was fully aware of the motion and a copy of the response Owen and OGM filed on behalf of Charles Bolton was provided to Bolton.  Bolton also knew that the Government had issued a trial subpoena to John Lee.

[17] During the hearing, the Court allowed all counsel to review parts of the relevant medical records of John Lee to confirm the representations made by his attorney.

9.     The argument that Owen waived John Lee's appearance defies reality. Surely, Charles Bolton must have insisted that his counsel argue the waiver issue because an informed attorney would not offer such an argument to this Court considering the clear record made by this Court on September 12, 2016, and applicable Fifth Circuit law.

10.    The remaining arguments by Charles Bolton are wrong on many levels. The John Lee conflict claims are based upon fiction and the undersigned must assume that present counsel was paid well by someone to assimilate motions with fictitious facts and arguments contradicted by the record in this case. Charles Bolton's argument is the proverbial "trying to fit a square peg in a round hole."

## XI.   THE ISSUES OF THE ABC, 27TH AVENUE PACKAGE, RETAINED ACCOUNTANT, FORMER IRS AGENT, AND MAGGIE HANCOCK

1.     The arguments as to the Alcoholic Beverage Control ("ABC") and 27th Avenue Package store purchases by John Lee are completely off base. Either present counsel is confused, or did not have the benefit of the trial transcript or both. Simply put, the arguments are factually and legally wrong. When an argument is factually off the accuracy radar, a brief statement as to the true fact suffices. The records from 27th Avenue Package Store were in fact subpoenaed by OGM. The 27th Avenue Package Store Customer Sales Detail for John Lee was admitted in evidence as Exhibit DC-76 and published to the jury during closing argument (Trial Transcript, p. 513). The ABC purchase records were analyzed and Owen and OGM prepared a five year cost/gross income analysis for both Sports 22 and Hall Avenue and both were admitted in

evidence.   Again, it is another example of trying to smear the reputation of Owen and OGM.

2.      Steve Theobald, the accountant hired by and paid for by OGM, was a non-testifying consultant to assist in preparing summaries, breaking down and analyzing the summaries submitted by the Government, preparing pro forma tax calculations for the indictment period, determining the total amount of deposits marked as loans for each year and for each Schedule C business.  Charles Bolton was fully aware of the role of the consultant.   In the early stages before a detailed analysis of the Government's documents was performed, OGM considered possibly retaining a forensic accounting expert[18] with a professional background of IRS service, but the cost could have been in the range of $40,000.00 to $50,000.00, if not more.  This additional money Bolton claimed he did not have and could not borrow.  More importantly, as Owen and OGM began the exhaustive process of analyzing five years of records for both Sports 22 and Hall Avenue, it became apparent that this case did not lend itself to expert testimony.  Stated differently, no forensic expert could opine why Linda employed the word "loan" to describe a deposit that was income or a deposit that was not income but supposedly a gift.  Similarly, no forensic expert could opine about the cashing of the John Lee checks by both Charles and Linda Bolton and no expert could opine why certain monies were deposited and certain monies were not deposited and why certain deposits were marked as a loan and other deposits were not.

---

[18] Ben Galloway made inquiry of possible forensic experts.

3.     The suggested testimony of Maggie Hancock, a Sports 22 employee, would have been of no value.  This case involved much more than the John Lee cashed checks.   An important issue was the other checks received from vendors and individuals as payment for food catering and food services marked as loans as well as certain liquor purchase receipts in the handwriting of Linda Bolton given to John Lee for the purchase of liquor from Hall Avenue Package, which invoice payment was also marked as a loan.   The accounting shows that during the five year period, approximately $393,000.00 was deposited into the accounts of Sports 22 and Hall Avenue Package and marked as loans.  Maggie Hancock's testimony would have hurt, not helped Charles Bolton.  Owen and Galloway were very concerned the Government would try to establish bias on the part of Ms. Hancock because according to Bud Holmes, he was the holder of a note Maggie Hancock executed.  Further, to focus on just the John Lee cashed checks is viewing this case through a fractured lens.

## XII.   *BRADY* VIOLATION, FALSE EVIDENCE, PHOTOGRAPHS, FALSE TAX COMPUTATIONS BY THE GOVERNMENT

1.     The above issues are classic examples of the shotgun approach employed by Charles Bolton. The Motions assert general claims, but offer zero authority to support the claims, other than the argument of counsel.  For example, Charles Bolton claims that the Government summary charts were "false."  How were the charts false? What are the correct computations?  To be quite frank, Charles Bolton and his attorneys have no earthly idea how or in what manner the charts are allegedly false.   The argument by Charles Bolton is simply a good sound bite.  Owen, Galloway, the non-testifying consultant hired by Owen and OGM and the OGM paralegal, Melissa Ballard,

reconstructed the Government charts. The charts were accurate, but not final. For the edification of Charles Bolton and his counsel, Charles and Linda Bolton had other unreported income that could have been added to the Government charts that would have increased the tax deficiency and added more damaging evidence before the jury. This argument is without merit.

2.      The argument about the photographs of John Lee's liquor underscores the desperate nature of the motions. The photographs were more beneficial to Charles Bolton than to the Government. The photographs reveal that some of the bottles were purchased at another liquor store, not Hall Avenue Package, and that the photographs were taken after 2013. Moreover, the allegation that the government introduced photographs for the first time during trial which had never been given to the defense prior to trial is incorrect. The photographs were provided to OGM on September 7, 2016 (the deadline for the parties to exchange exhibits) as Exhibit G-69. OGM provided the photographs to Charles Bolton and Owen, Galloway and Ballard discussed the photographs with Bolton prior to trial.

3.      Charles Bolton also claims that Agent Luker improperly presented various summaries of the evidence that were already presented to the jury. Owen cannot respond to this argument because it makes no sense.

4.      Charles Bolton argues that the trial court did not test the accuracy of each summary used by the Government. Bolton also claims the summaries were not presented to trial counsel for Charles Bolton until the day of trial. This is incorrect.

Further, there is no obligation on the part of the trial judge to test the accuracy of a summary supported by underlying data under Fed. R. Evid. 1006.

5.      The summaries were produced to all counsel of record in April 2016 (even Bud Holmes who may not have studied a single summary) and supplemented prior to trial.  Owen, Galloway and OGM discussed the summaries with Charles Bolton on multiple occasions and also discussed with him the significance of the summaries as well as the summaries prepared by Owen, Galloway and OGM.  Owen, Galloway and OGM prepared parallel summaries.  The discussions of the summaries occurred over a period of months in the presence of Charles Bolton.  Also, the Government summaries and the OGM summaries were discussed with Linda Bolton's former attorneys Bud Holmes, Jim Dukes, Lisa Ross, Carlos Tanner, Rob McDuff, as well as with Phil Hull. Each time a summary was discussed with another of Linda Bolton's attorneys, Charles Bolton was present.  In fact, copies of the summaries were also furnished to Charles Bolton.  There was no material difference in the Government's summaries and the summaries prepared by Owen, Galloway and OGM.  If anything, the OGM summaries reflected a larger tax deficiency.

## XIII.   PRESENTENCE INVESTIGATION REPORT AND THE MARCH 17, 2017 SENTENCING

1.      The Presentence Investigation Report ("PSR") was furnished to Charles Bolton.  Owen and OGM spent an inordinate amount of time preparing the Objection to the PSR.  For assistance, Owen and OGM retained a sentencing expert to review the PSR.

2.     The Addendum argument by Charles Bolton is wrong.  The two level enhancement forms a part of the original PSR.  The addendum changed nothing as to the final offense level.  It did not add additional enhancements to the final offense level reflected in the original PSR.  The addendum simply included the penalty and interest. The probation officer advised at the time of the continued December 19, 2016 sentencing that an addendum would be submitted to address the penalty and interest features. Charles Bolton well knew this because he was standing in the courtroom when the probation officer told Owen his intent to add the penalty and interest.  Moreover, Charles Bolton was told by Owen at the time the original PSR was submitted that he could face an interest and penalty assessment above the actual tax deficiency claimed to be owed on the five evasion counts (§7201).  Moreover, a conviction under 26 U.S.C. §7201 will collaterally estop denial of the civil fraud penalty under I.R.C. §663 for the same taxpayer, same tax year and type of tax.

3.     Charles Bolton complains about his decision to allow Owen to represent him during the March 17, 2017 sentencing hearing.  Charles Bolton had several options. Robert Udashen and Sam McHard[19] could have appeared and participated in the hearing.  The Public Defender, Dennis Joiner, was present at the direction of the Court and consulted with Charles Bolton and could have participated.  Willie Huntley, although he chose not to be admitted *pro hac vice* until after the sentencing, was also present and was advised he could participate through communications with Owen.

---

[19] When an attorney enters an appearance in this Court, he does not have the option of choosing when he wants to appear for a scheduled hearing.  There were no restrictions or conditions on McHard's entry of appearance or the *pro hac vice* admission of Robert Udashen.  McHard's name appears on the Motions filed by Huntley and Knizley.

34

Huntley had the right to make recommendations to Owen; he had the right to approach Owen with any suggested witnesses and he had the right to ask any question of Owen. Instead, Huntley opted to do nothing. Huntley sat mute at counsel table taking notes. Huntley had every opportunity to raise any issue with Owen. The stark reality is Huntley was a note taker for the sole purpose of preparing the post sentencing Motions.

4.      Charles Bolton places fault on Owen and OGM for the sentence meted out by this Court. Charles Bolton has no person to blame but himself. Charles Bolton knew his exposure and was offered a plea arrangement prior to jury selection, which remained open until the conclusion of the jury selection. The offer was a plea to one count based on the deposited checks marked as loan and excluding the John Lee cashed checks[20]. This proposal would have alleviated the specific offense enhancement under §2T3.1(b). With acceptance of responsibility, this would have placed the final offense level at 11 with a Criminal History Category of I and a tax loss under $100,000.00. Owen and Galloway, at different times before, during and after the jury selection, discussed the offer with Charles Bolton and he rejected the offer unless there was a guarantee of probation/home confinement. Assuming a final offense level of 11, the sentencing range would be eight to fourteen months before the filing of a 5k.1. Probation and home confinement was a possibility but not an absolute.

---

[20] Several months prior to the trial the Government offered a plea on 18 U.S.C.A §1961 relating to the cashing of checks. The Government would have dismissed the indictment and Charles Bolton would have pled on Information. Charles Bolton rejected the offer and advised that he would not enter a plea to a felony. Owen countered the AUSA with an offer to plead to a misdemeanor which the Government flatly rejected.

5.     Charles Bolton had three months to cooperate with the Government, if that was his intention.  At Bolton's request, Owen convinced Fred Harper, the AUSA, to allow Bolton and John Chain the opportunity to work with the Government. Instead, Bolton, with the support of John Chain, spent time hiring lawyers and trying to continue the sentencing hearings so that Bolton's lawyers would have time to prepare the subject Motions in the event his so-called cooperation did not work out.  At one point during the early cooperation period, Owen sent an email to Charles Bolton expressing concern about Charles Bolton's lack of commitment to cooperate.  The email was necessary because the Government had concerns that Bolton was not cooperating. See email from Owen to Charles Bolton dated January 24, 2017, **Exhibit 19**.   The affidavit of Carl Nicholson is probative evidence of Charles Bolton's manipulation of Owen and the system.   The affidavit of Carl Nicholson is dated January 20, 2017. Charles Bolton is allegedly cooperating with the Government at the same time the Nicholson's affidavit is signed, yet Charles Bolton and Carl Nicholson are working on an affidavit in support of the John Lee conflict argument if the cooperation does not bode well for Charles Bolton.

## XIV.  JOHN LEE CASHED CHECKS BOLTON'S DECISION NOT TO TESTIFY-BOLTON'S CLAIM HE TOLD OWEN/GALLOWAY THAT HE DID NOT RECEIVE ANY MONEY FROM THE JOHN LEE CASHED CHECKS AND BOLTON'S INCONSISTENT REASONS FOR THE CASHED CHECKS

1.     The John Lee cashed checks spanned the entire five year time period charged in the indictment.  When Charles Bolton was indicted in March 2016, Charles Bolton never mentioned the possible reasons for the indictment.  It was only after Owen, Galloway and Ballard received the Government's discovery and the initial

production of the summaries prepared by Bradley Luker that the scope and depth of the evasion charges were discovered. When Charles Bolton was queried about the cashed checks, he commented that he "cashed a few checks for John Lee." The few checks translated into over a quarter of a million dollars. When inquiry was made as to the reason Charles Bolton cashed the checks, he responded at different times as follows:

A.    Charles Bolton stated the checks were cashed and the cash given to John Lee. Charles Bolton stated that the cash, or some part of it, was used by John Lee to provide a confidential source of cash for John to subsidize a female friend. Charles Bolton claimed he did not know the name of the friend and did not know her home address, other than she moved around between Louisiana and Texas[21]. The amount of the cash allegedly given to the female friend is unknown. It was difficult to comprehend that Charles Bolton (and in some instances Linda Bolton) was cashing checks for John Lee for five years and was clueless as to the identity of the female friend, assuming there was even a female friend.

B.    Charles Bolton stated that part of the cash was used by Charles Bolton and John Lee to gamble. Charles Bolton claimed that he and John Lee gambled each time a check was cashed and John Lee would give him money to gamble. If Charles Bolton lost the money gambling, he was not obligated to pay back Lee. If he won, the winnings were retained by Charles Bolton. Charles Bolton

---

[21] Charles Bolton insisted that Owen advise AUSA Fred Harper that the cash from the John Lee cash checks was returned to Lee for the use-benefit of a female companion. Owen followed the directive of Charles Bolton, but Charles Bolton claims he did not know the identity of the female companion. Fred Harper agreed to interview the female companion if Bolton identified her. Charles Bolton never provided Owen with a name, although Owen inquired repeatedly. If this person existed, Fred Harper was willing to validate Charles Bolton's version of part of the cashed checks. Further, although Linda Bolton cashed approximately four of the John lee checks, Charles Bolton could offer no explanation as to her involvement.

identified the Beau Rivage as the casino of choice for most of the gaming. Charles Bolton could not even provide a ballpark figure as to the amount of cash given to him to gamble. When questioned why John Lee would give him large sums of money, Charles Bolton responded that he and Lee were good friends and he provided valuable assistance to John Lee and his family, including Lee's son and Lee's mother, and also assisted Lee in salvaging a very profitable lawsuit. Charles classified the relationship as family.

C.   Charles Bolton stated that some of the money was "given to him," presumably in the nature of a gift that had no connection to the gambling money.

D.   At a defense meeting believed to be in June 2016 in the office of James Dukes, Charles Bolton made a statement in the presence of Owen, Galloway, Melissa Ballard, and Phil Hull that all of the cash from the John Lee cashed checks was retained by him. Charles Bolton later retracted the statement. Owen, Galloway and OGM were facing a moving target with Charles Bolton.

2.   From the outset of the tax case, it was agreed by the attorneys initially involved that both Charles and Linda Bolton must testify. The defense strategy Owen, Galloway and OGM worked on from April 2016 to the end of August 2016 was consistent with the statement Linda Bolton made to the Court during her sentencing in response to the question asked by this Court why she classified certain deposits as a loan. The exhibit list for Charles and Linda Bolton was worked on and formulated exclusively through the efforts of Owen, Galloway and OGM over a period of months. The SBA documents included in the exhibit list and the admitted stipulation are documents tied to the anticipated testimony of Linda Bolton. The entire defense was

carefully formulated, but the testimony of Linda Bolton was crucial because Charles claimed he had no knowledge of the deposits marked as loans and was not aware that Linda marked deposits as a loan until after the tax indictment.  Charles Bolton also claimed he could not explain why Linda marked certain deposits as loans.  This underscores why Linda was a crucial witness.  However, in the latter part of August 2016, shortly before the trial, the entire defense changed and Owen, Galloway and OGM were advised that Linda would not testify.  Although Charles Bolton well knew and understood the importance of Linda testifying, Charles Bolton claimed that it was the decision of Linda and her attorney and he was not in a position to change it.  Owen and Galloway implored Charles Bolton to intervene, but he refused.  This changed the entire defense strategy and affected Charles Bolton's anticipated testimony.  See letter from Owen to Charles Bolton dated September 19, 2016, and emailed to Charles Bolton on September 20, 2016, **Exhibit 20.**

3.      The problem with Linda not testifying was discussed with and explained to Charles Bolton in detail on multiple occasions and as late as the night before the defense would move forward with their case.  Charles Bolton basically took the defense of the case away from Owen and Galloway.  Neither Owen nor Galloway believed that Charles Bolton could not intervene, if he chose to, in the decision not to allow Linda Bolton to testify.  It is disturbing how the trial preparation and the defense Owen, Galloway and OGM worked on for months could disappear in a matter of few days.  See affidavit of Katie Rhodes, **Exhibit 21**. See affidavit of Jonah Blum, **Exhibit 22.**

4.      The underpinning of the initial defense strategy of Owen, Galloway and OGM was to aggressively challenge Nicholson & Co., particularly Carl Nicholson[22]. This strategy was abandoned and the new approach in part was to "work with" Renee Moore, as opposed to strenuously cross-examining her about her actions, and the actions of Carl Nicholson and Nicholson & Co.  As predicted by Owen and Galloway, Renee Moore proved to be a hostile witness to Charles and Linda Bolton.  Charles Bolton was in agreement with the new strategy.  Now, it is readily apparent from reading the motions and the affidavit of Carl Nicholson that the bond between Charles Bolton and Carl Nicholson was, and still, is impenetrable.  It is almost certain that Charles Bolton disclosed to Carl Nicholson the intent of Owen and OGM to lay the blame for the indictment at the feet of Nicholson.  The defense worked on by Owen, Galloway and OGM included the Section 8(a) program, the allocation of activities of Sports 22 and the segregating of the business activities of Sports 22.  Carl Nicholson was intimately involved in obtaining the Section 8(a) certification for Linda and Sports 22 and was equally involved in the SBA annual audits.  This was the reason for the characterization of deposits as loans from the catering business of Sports 22 to the brick and mortar business of Sports 22.

5.      Owen and Galloway spent hours with Charles Bolton covering questions he may be asked on cross examination if he testified without Linda's foundational testimony.  In fact, Owen, Galloway and Bolton went through a simulated cross examination on at least two occasions during the trial in the work room of a hotel in the

---

[22] Presumably, Nicholson was told by Charles Bolton that part of the trial strategy included challenging Carl Nicholson and his involvement with the tax returns for the Bolton's and for John Lee.

presence of Melissa Ballard, the OGM paralegal, and Katie Rhodes, an OGM file clerk, in the event Charles Bolton elected to testify. Charles Bolton was unable to answer many questions and unable to explain those he did answer. Owen did tell Bolton that on the witness stand he was on his own; that neither he nor Galloway could help him nor could Owen lead him to a proper answer on direct. Bolton expressed his desire not to testify and Owen and Galloway left that decision exclusively with Charles Bolton. Owen and Galloway told Charles Bolton in no uncertain terms that if he wanted to testify we could try and limit the direct examination, but there was a high probability he would be crossed extensively about the work papers Linda delivered to Nicholson & Co. for five years as well as classifying income and other deposits as loans. Also, Charles Bolton was told he would be cross-examined about his relationship with Carl Nicholson. Owen and Galloway repeatedly told Charles Bolton, as well as his brother Terrell Bolton, that the changed defense theory and the refusal of Linda Bolton to testify created a significant void in the defense of the case and it could result in an adverse verdict.

Once Charles Bolton made the decision not to testify it was confirmed by this Court on the record. The following colloquy occurred between Judge Starrett and Charles Bolton and Linda Bolton at a time when Charles and Linda were under oath:

> **THE COURT:  All right. I'm going to ask the**
> **defendants to please stand and raise your right hands, please.**
>
> **CHARLES and LINDA BOLTON,**
> **having been first duly sworn, testified as follows:**

THE COURT: You may put your hands down.
Mr. and Mrs. Bolton, each of you have a constitutional
right to testify, and the decision as to whether you testify or
not is yours. It's not your lawyer's.
You have -- certainly you should listen to your -- each of
you should listen to your lawyer's advice and counsel, but the
decision as to whether or not to testify is not your lawyer's
to make.
I understand that you have chosen not to testify; is that
correct, Mr. Bolton?

DEFENDANT CHARLES BOLTON: That's correct, your Honor.

THE COURT: Mrs. Bolton; is that correct?

DEFENDANT LINDA BOLTON: That's correct.

THE COURT: Do you have any questions you want to ask
the court about that? Anyone of you?

DEFENDANT CHARLES BOLTON: No, your Honor.

DEFENDANT LINDA BOLTON: No, sir.

Trial Transcript, Vol. III, Pg. 473-474.

## XV. THE CLAIM THAT AN INDICTMENT UNDER 26 U.S.C. §7201 IS INCONSISTENT AND THE CHARGES UNDER 26 U.S.C. §7206 SHOULD HAVE BEEN CONSIDERED A LESSER INCLUDED OFFENSE

1.      Charles Bolton appears to claim that he should not have been indicted,

convicted and sentenced under both 26 U.S.C. §7201 and 26 U.S.C. §7206 because a

violation §7206 is a lesser included offense and this Court failed to instruct the jury

accordingly. It is unclear if Charles Bolton is adding this claim under the laundry list

designated for Owen. Regardless, it is permissible to charge a 26 U.S.C. §7201 violation

with a parallel charge under 26 U.S.C. §7206 in the same indictment emanating from the

same tax years. It appears that counsel for Charles Bolton adopted in part the Objection

to the PSR filed by Owen on behalf of Bolton on the issue of sentencing but the objection is not based on the reasons assigned by Bolton.

2.      The filing of a return is not element of the crime of tax evasion under 26 U.S.C. §7201. *United States v. Robinson,* 974 F.2d 575 (5th Cir. 1992). The argument that the affirmative acts in the Charles Bolton indictment under §7201 was the filing of a false returns is simply wrong.   The affirmative acts were the cashing of tens of thousands of dollars in checks, providing deceptive records to their tax return preparer and making false statements to their preparer that some payments for goods and services were loans. The case relied on by Charles Bolton, *United States v. Doyle,* 956 F.2d 73 (5th Cir. 1992) is factually and legally different.  In *Doyle,* the Defendant was indicted on three counts in violation of 26 U.S.C. §7201.  The issue was the right of a lesser included instruction under 26 U.S.C. §7203, the failure to file/pay a tax misdemeanor statute to 26 U.S.C. §7206.  The Court held in *Doyle* that a Defendant is entitled to lesser-included offense instruction only if there is a disputed issue of fact as to an essential element of the charged offense which is not a material element in the lesser-included offense.

## XVI.   THE MOTION FOR RELEASE [DOC. 218] FILED MAY 1, 2017

1.      The Motion for Release [Doc. 218] filed May 1, 2017, mirrors the arguments advanced in the other Motions filed by Huntley, Knizley and Henderson. This Motion for Release was filed by a different attorney, William C. Walter. In fact, the attorneys identified herein who have advanced almost identical Motions maintain

separate offices[23] with the exception of Knizley, whose professional affiliation with Huntley is not precisely known.

2.      Owen, Galloway and OGM are compelled to respond to certain issues raised in [Doc. 218] relating to the testimony of Bradley Luker and the claim that Owen, Galloway did not lodge an objection to his testimony; the sentencing hearing; the checks Lee is claimed to have written to Bolton and not shown as income and the Owen, Galloway and OGM filing under seal certain OGM documents.

3.      The testimony of Luker was important and probative in demonstrating to the jury that the only basis for classifying the cashed checks as income was an unsupported and non-specific statement from John Lee that the Lee checks were for the purchase of goods and services.  There were only a handful of receipts relating to Hall Avenue Package and nothing from Sports 22.  This unsupported statement by John Lee with no time period; no transactional documents as to the amount of the purchase of goods and services; no description of the goods and services purchased; and no delineation between deposited and cashed checks underscored the Rule 29 argument Owen advanced that classifying the checks/cash as income was at best thinly veiled.

4.      Moreover, the argument that such testimony is hearsay is incorrect.  The Government could have and would have argued that John Lee was an unindicted co-conspirator and his statement to Bradley Luker was admissible under the Fed. R. Evid. 801(d)(2)(E), a statement made by the party's coconspirator during and in furtherance of the conspiracy.  *United States v. Triplett*, 922 F.2d 1174 (5th Cir. 1991); *United States v.*

---

[23] Huntley and Knizley practice in Mobile, Alabama. Henderson practices in Jackson, Mississippi and Walter practices in Hattiesburg, Mississippi.

*Rodriquez*, 689 F.2d 516 (5th Cir. 1982). The Government could have classified John Lee as a *Klein* coconspirator. *United States v. Klein*, 247 F.2d 908 (5th Cir. 1957). The application of the co-conspirator exception may be extended in instances where the co-conspirator is trying to avoid punishment.

5.      As to the sentencing hearing, particularly the *in camera* hearing, Mr. Walter asserts as an absolute fact on page 6 of the Motion that "**...the Court directed that Owen represent Mr. Bolton's sentencing arguments.**" This factual account is wrong. The Court allowed Charles Bolton, Linda Bolton, Rob McDuff, Willie Huntley and the Public Defender, Dennis Joiner, to caucus privately to discuss and determine if Charles Bolton desired to proceed through the sentencing with Owen or Dennis Joiner. Charles Bolton, after consultation with his new counsel Willie Huntley and with Dennis Joiner, opted to proceed with Owen. To be sure, the Court stated the following on the record:

> **THE COURT:  I'm going to ask Mr. Huntley and Mr. Joiner and Mr. and Mrs. Bolton and Mr. McDuff to talk.  And I'm requesting that you present your argument.**
> **MR. OWEN:  I will.**
> **THE COURT:  If they don't want your argument, then that's their option. They will have that option to ask you to stand down.**
>
> **THE COURT:  Yes, sir. We're going forward with it today.**
> **So why don't we step out.  And, Mr. Owen, if you would well, first of all, why don't we let Mr. Huntley and Mr. Joiner and Mr. and Mrs. Bolton talk, and Mr. McDuff, if he wants to participate, and decide exactly what role they want you to play, Joe Sam.  Because I think that you're obviously very familiar with the case.**

Transcript of *in camera* hearing, pgs. 39-42.

It is also noteworthy that Willie Huntley was seated at counsel table during the entire courtroom sentencing hearing and had the right to discuss with Owen any part of the sentencing, or to make suggestions or recommendations if he chose to. Further, Willie Huntley and Charles Bolton had the benefit of discussions outside the courtroom during breaks in the sentencing. In fact, during the sentencing hearing the Court took a short recess and Charles Bolton and Huntley were in conversation and when the sentencing resumed and during the latter part of his allocution, Charles Bolton requested a *Garcia* hearing. Neither Bolton nor Huntley were concerned about the sentencing. Their only concern was to make a record for appeal. Charles Bolton has added the sentencing hearing to the list of complaints.

6.     On page 15 of the Motion [Doc. 218], Mr. Walter on behalf of Charles Bolton articulates a factual account of "checks made payable to Bolton for catering and expenses." On the same page, it is argued that "Mr. Bolton later testified at sentencing that he never received the proceeds from the checks found in Mr. Lee's ledger." This argument is factually incorrect on several levels. First, counsel does not differentiate between deposited checks and the cashed checks. Equally troublesome with Mr. Walter's argument is the fact that some cash received from the cashed checks was deposited[24]. Aside from the argument discussed above, certain of the cash from the cashed checks did inure to the benefit of Charles Bolton because Charles Bolton and John Lee used the cash money to gamble. This account was told to Owen, Galloway, and Melissa Ballard repeatedly from April 2016 to the September trial date and was also

---

[24] At the time of cashing the checks, some the cash was deposited in the account of Sports 22 and some deposited in the account of Hall Avenue Package.

told to his brother, Terrell Bolton, in the presence of Owen, Galloway and Ballard. In part, gambling was the reason for the IRS civil adjustment for the tax year 2010. Charles and Linda Bolton reported on the 1040 return for the calendar year 2010 gambling winnings of $5,840.00 when it reality it was $41,140.00. Also for the period 2011-2013, the Bolton's reported gambling winnings of $153,423.00 and ironically the Bolton's reported $153,423.00 in gambling losses[25], the exact same amount as the gambling winnings for the same tax periods of 2011-2013. That, standing alone, does not convert the gambling money to income, but on another level it does raise concern that Mr. Walter pointed out and argued to this Court that his client, Charles Bolton, while under oath "**testified at sentencing that he [Bolton] never received the proceeds from the checks found in Mr. Lee's ledger.**" See p. 15. Also, Mr. Walters pointed out on the same page that "**Mr. Bolton repeated (sic) told the Court that he had told his attorney that Mr. Lee received all of the funds and that Mr. Bolton did not receive any of the funds listed in the ledgers.**" This representation by Charles Bolton is not close to correct and why counsel would emphasize a possible perjurious statement to this Court is unknown. Aside from the gambling venture, some money was given to Charles Bolton and the intent was to claim the money as a gift. It was the strategy of Owen, Galloway and OGM to argue that the gifted money was within the permissible per

---

[25] Gambling losses can be deducted only to the extent of the gambling winnings. Gambling losses are difficult to prove but easy to deduct.

donee annual exclusion for the 2009 to 2013 time period[26]. The Government designated its own tax expert to challenge the validity of the gift argument.

7.      The OGM documents filed under seal was necessary in the event an appellate court did not have the benefit of a response from Owen, Galloway and OGM.[27] The argument here is a violation of the attorney-client privilege. How is such a violation of the attorney-client privilege, other than claiming that it is? This argument is just another example of claiming an impropriety without any basis to support it. This has been the *modus operandi* of counsel in all four of the Motions filed [Docs. 175, 177, 181, 218]. Ironically, the motions filed by Charles Bolton have rendered moot the attorney-client privilege. The privilege is now waived.

## XVII. MOTION TO VACATE / NEW TRIAL FILED BY LINDA BOLTON [DOC.178]

1.      Linda Bolton advances the argument that a disagreement among Owen, Galloway, OGM and Linda's trial counsel, McDuff, about the trial defense strategy created a conflict such that it impacted McDuff's performance as counsel and it impacted the trial such that Linda did not receive the benefit of effective assistance of counsel or a fair trial. The disagreement had no effect on McDuff's performance and it had no effect on Linda Bolton's or Charles Bolton's right to a fair trial. To be quite succinct, Linda Bolton and Charles Bolton fully and completely agreed with and approved the defense strategy recommended by Rob McDuff.

---

[26] The annual gift tax exclusion for part of the five year indictment period was $13,000.00 and increased to $14,000.00 for other parts of the indictment period.

[27] The misleading and false statements set forth in the various motions were justification for filing OGM documents under seal.

2.      Linda Bolton's motion advances the same arguments advanced by Charles Bolton in the motions he filed as to the John Lee money borrowed by Charles Bolton to defend the food theft case. For the sake of expediency, Owen and OGM adopt by reference the same responses made to the Charles Bolton motions.

## XVIII.  2010 AUDIT AS DESCRIBED IN THE MOTIONS

1.      It is claimed by Charles Bolton that the civil audit adjustment for the gaming winnings in 2010 is in some manner dispositive of any alleged criminal wrongdoing as charged in Counts 2 and 7 of the subject Indictment. Charles Bolton claims that Owen should have sought dismissal of Counts 2 and 7. A civil audit adjustment increase on gambling winnings generated by the W2-G or the 1099 received by the IRS does not foreclose a criminal prosecution under §7201 and §7206. Nothing further need be said.

## XIX.  OWEN SHOULD HAVE OBJECTED TO THE BLIND STRIKE METHOD

1.      A claim is asserted that Owen[28] should have objected to the blind strike method used by this Court during jury selection. As part of the objection, Charles Bolton claims that this method foreclosed his right to exercise *Batson* challenges. First, there is no authority submitted that the blind strike method is constitutionally deficient. Second, Charles Bolton did not identify by name one African-American prospective juror that was struck from the jury panel by the Government that could have been the subject of the three-prong *Batson* challenge. Third, the blind strike method does not foreclose a *Batson* challenge. Fourth, the foreperson of the jury was African-American.

---

[28] Ben Galloway handled the jury selection part of the trial.

## XX.   THE CHARTS AND SUMMARIES PREPARED BY OWEN AND OGM; THE FAILURE TO HIRE AN EXPERT TO ESTABLISH THE CLAIMS OF FAULTY TAX DEFICIENCY CALCULATIONS AND FAULTY DETERMINATION OF DEPOSITED AND UNDEPOSITED INCOME

1.      In each of the motions filed, Charles Bolton sets forth a repeat narrative of fact when in reality the factual recitations are skewed and no bases exist for the arguments.   For example, Owen and OGM prepared numerous charts designed to validate the tax deficiency and the accuracy of the funds marked as loans and those that were not classified.   Owen and OGM prepared cost/revenue analysis for Sports 22 and Hall Avenue that were admitted in evidence.   Also, Owen and OGM prepared a pro forma tax calculation for the relevant years identifying the tax deficiency as claimed by the Government.   Owen also prepared a demonstrative chart for use during the trial, including the testimony of Linda Bolton.   Of course, that never reached fruition.   See a copy of the demonstrative chart, **Exhibit 23**.

2.      The hiring of an expert would not have benefitted Charles Bolton without the foundational testimony of Linda Bolton, and then the expert would have still encountered problems because the paramount issues of Linda Bolton marking certain deposits as loans on the monthly worksheets and the cashing of checks are matters that do not fall within the purview of Fed. R. Evid. 702.   A jury does not need an "expert" to explain marking a deposit as a loan or the cashing of checks.   Moreover, an expert could not have changed the loan classification assigned to the Manheim and National Guard deposited money that was without dispute income.   Further, an expert would have faced tremendous obstacles trying to parse out the "loans" from "gifts" and at the same

50

time trying to explain that part of the cashed checks inured to the benefit of Charles Bolton, Sports 22 and Hall Avenue. Further, some of the payments from the credit card entities were also marked as loans and some were not. Also, once Manheim initiated electronic deposits to the account of Sports 22, the classification of a loan stopped. How does an expert explain that scenario?

3.     Charles Bolton has not shown in the motions the first erroneous calculation nor has Charles Bolton demonstrated that an expert could have unraveled the accounting methodology used by Linda Bolton with the tacit approval of Carl Nicholson. The motions are nothing more than naked allegations without the first supporting calculation or underlying document.

## XXI.   STATEMENT OF GEORGE CLARK

1.     The expert statement of George Clark is saturated with factual allegations that are blatantly false. In paragraph 6 of his statement, Mr. Clark admits "there are a number of factual disputes, where the record to date is either contradictory or ambiguous." Mr. Clark further qualifies his opinion with the statement "I have made assumptions of those facts and have so indicated. But I am not offering a professional opinion as to the accuracy of those factual assumptions." The net effect of this qualifier means Mr. Clark is predicating his opinion on facts that could be [and in fact are] erroneous, yet he tenders his opinion with the caveat that the factual assumptions may not be accurate. In the world of expert testimony, these qualifiers will never meet the reliability prong of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Fed. R. Evid. 702 places limits on the admissibility of expert testimony. The Court must

ensure at the outset that the testimony is relevant and reliable. *Daubert,* as enunciated in *Kumho Tire Co., v. Carmichael,* 526 U.S. 137 (1999), applies to technical and other specialized knowledge in addition to scientific knowledge.

2.     Under the title **FACTUAL ALLEGATIONS**, Mr. Clark relied on assumed facts that Owen had a "conflict that included having accepted payments from a key Government witness, Mr. John Lee and refusing to call Mr. Lee to testify at trial." Par. 8. This factual allegation is a part of the extreme falsehoods Mr. Clark relied on. In paragraph 12, Mr. Clark relied upon the misleading factual allegation that "at sentencing the Court refused to allow Mr. Owen to be terminated. Mr. Owen represented Mr. Bolton at the sentencing." In paragraph 13, the charade continues with the statement "Mr. Owen's legal fees for representing Mr. Bolton had been paid by John Lee." Mr. Clark just bought into Charles Bolton's spin on the facts.

3.     The statement of Mr. Clark is a purchased statement that is not worth the paper it is written on. In fact, submission of such a so-called expert statement is dangerously close to conduct that could merit sanctions.

4.     As the Court will notice, the statement is simply a signed statement by Mr. Clark. Mr. Clark certainly knew better than submit a statement under oath with the assumed facts he relied on.

## XXII. <u>CONCLUSION</u>

Owen, Galloway, and OGM vehemently deny that a conflict of interest existed with John Lee and Charles Bolton and deny that Owen, Galloway and OGM failed to provide to Charles Bolton effective assistance of counsel. This Court has seen through

the Response and this Memorandum Brief the chicanery and the tomfoolery that has

occurred with Charles Bolton from the start of the tax case to date.

RESPECTFULLY SUBMITTED, this the 11th day of June, 2017.

JOE SAM OWEN AND
OWEN, GALLOWAY & MYERS, P.L.L.C.

BY: _____

JOE SAM OWEN, MSB #3965

JOE SAM OWEN, MSB #3965
BEN F. GALLOWAY, MSB #4390
OWEN, GALLOWAY & MYERS, PLLC
1414 25th Avenue
Post Office Drawer 420
Gulfport, Mississippi  39502-0420
Telephone:   (228) 868-2821
Facsimile:   (228) 864-6421
E-Mail:      jso@owen-galloway.com
             bfg@owen-galloway.com

CERTIFICATE OF SERVICE

I, JOE SAM OWEN, of the law firm of Owen, Galloway & Myers, P.L.L.C., do hereby certify that I have this date conventionally filed under seal the above and foregoing *Memorandum in Support of Response of Joe Sam Owen and Owen, Galloway & Myers to the Motion for New Trial [Doc. 175], Motions to Vacate Conviction and Sentence or a New Trial [Docs. 177, 178, 181] and Motion for Release [Doc. 218]* with the Clerk of the Court pursuant to the Order [Doc. #273] of the Court dated June 7, 2017.

SO CERTIFIED, this the __11th__ day of June, 2017.

_____
JOE SAM OWEN, MSB #3965


JOE SAM OWEN, MSB #3965
BEN F. GALLOWAY, MSB #4390
OWEN, GALLOWAY & MYERS, PLLC
1414 25th Avenue
Post Office Drawer 420
Gulfport, Mississippi  39502-0420
Telephone:    (228) 868-2821
Facsimile:    (228) 864-6421
E-Mail:    jso@owen-galloway.com
           bfg@owen-galloway.com

54