**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                        **CRIMINAL ACTION NO. 2:16-CR-7-KS-MTP**

**CHARLES BOLTON and
LINDA BOLTON**

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on the "Motion for New Trial Due to Defense Counsel for Defendant Charles Bolton Commenced the Representation With an Actual Conflict of Interest" ("Charles's First Motion for New Trial") [175], "Motion to Vacate Conviction and Sentence and in the Alterative, for New Trial Under Federal Rule of Criminal Procedure Rule 33 and Request for Garcia Hearing" ("Charles's Second Motion for New Trial") [177], "Motion to Vacate Conviction and Sentence and in the Alternative, for New Trial Under Federal Rule of Criminal Procedure Rule 33 and Request for Garcia Hearing" ("Charles's Third Motion for New Trial") [181], and "Expedited Motion by Charles Bolton to Vacate Conviction and Sentence, or in the Alternative for New Trial, Based on Newly Discovered Evidence and Prosecutorial Misconduct" ("Charles's Fourth Motion for New Trial") [226] filed by Defendant Charles Bolton, and the "Motion to Vacate Conviction and Illegal Sentence or in the Alternative, for New Trial Under Federal Rule of Criminal Procedure Rule 33 Based on New Evidence" ("Linda's First Motion for New Trial") [178] and "Limited Supplemental Motion to Vacate and/or for New Trial" ("Linda's Second Motion for New Trial") [231] filed by Defendant Linda Bolton. After considering the submissions of the parties, the record, and the applicable law, the Court finds that these motions are not well taken and should be denied.

# I.  BACKGROUND

On March 22, 2016, a federal grand jury indicted Defendants Charles Bolton ("Charles") and Linda Bolton ("Linda") (collectively "Defendants") on five counts of attempted tax evasion for the years 2009-2013 (Counts 1-5) under 26 U.S.C. § 7201 and five counts of filing false tax returns for those same years (Counts 6-10) under 26 U.S.C. § 7206(1).  Attorney Joe Sam Owen ("Owen") filed his initial appearance on behalf of Charles on March 28, 2016.  Attorney Paul Holmes ("Holmes") initially appeared in this case on behalf of Linda at her initial appearance before the magistrate judge on March 31, 2016.  Parties are husband and wife, and represented to the Court that there was a joint defense agreement between them.  It was discussed on the record that Owen was taking the lead in the defense.[1]  He hired experts to review the records and provided help in the defense of both Defendants.

Trial was initially set for May 23, 2016.  Defendants filed a joint Unopposed Motion to Continue [17] on April 25, 2016.  The Court granted this motion on April 29, 2016, and the trial date was then set for July 18, 2016.

Attorney James K. Dukes ("Dukes") filed his appearance in the case on behalf of Linda on June 22, 2016, less than four weeks before trial.  It was represented to the Court by both Dukes and Owen on the record in multiple hearings that Dukes was retained by Linda because Holmes needed some help understanding the case and had not practiced in federal court in a number of years.  Despite the circumstances and the short time her new attorney had to prepare for the impending trial, Linda did not file for a continuance.

---

[1] This discussion took place during the disqualification hearing held before the Court on July 28, 2016.

Due to courtroom unavailability[2] and after conferring with the parties to ascertain any objections, the Court *sua sponte* continued the case until August 22, 2016.

Because they were potential witnesses in the case,[3] Holmes and Dukes were disqualified from the case in a hearing held on July 28, 2016,[4] and the Court gave Linda ten days to find new representation. On August 8, 2016, the deadline the Court originally gave Linda to find a new attorney, Attorney Lisa Ross ("Ross") entered her appearance on behalf of Linda. Attorney Carlos Tanner ("Tanner") attempted to enter his appearance as well, but it was not properly filed. Tanner did not properly enter his appearance in the case until August 12, 2016. Nevertheless, both Ross and Tanner appeared on behalf of Linda on August 10, 2016, at a telephonic hearing pertaining to the possibility of obtaining a continuance in this case. The Court advised parties that a motion to continue had to be filed before it could grant a continuance. The Court further informed the parties that the only trial dates available to continue the case until would be either August 29, 2016, or September 12, 2016, due to the scheduling constraints caused by the Court's own docket as well as Owen's and AUSA Fred Harper's conflicts,[5] which had long been brought to the attention of the Court. When Ross asked about dates in December, the Court advised her that it did not feel such a long continuance would be appropriate given the nature of the case, but that it would consider any arguments she may make if she filed a motion.

On August 12, 2016, the Court held a telephonic conference with the parties to remind them that, because a motion for continuance had yet to be filed and the trial date was still set for August 22, proposed jury instructions and the parties' exhibit and witness lists were due the

---

[2] Both courtrooms in Hattiesburg were undergoing renovations and were not serviceable for most of the month of July.
[3] Checks from both attorneys were included as evidence of Defendants' undisclosed income.
[4] This disqualification hearing occurred after the Government filed its Motion to Disqualify [26] on July 15, 2016.
[5] Owen informed the Court much earlier in the case that he would be unavailable for the entire month of October. AUSA Harper was equally upfront with the Court about his unavailability during November.

following Monday on August 15, 2016. Ross informed the Court that she intended to file a motion for continuance that day on behalf of Linda, and Owen confirmed that he would join in whatever motion she filed on behalf of Charles. Ross contacted the Court later that date seeking information regarding the ordering of transcripts of previous proceedings. She then filed the Motion to Continue [42][43][6] on behalf of Linda late that evening, after business hours. Because it was a Friday, the Court did not receive the motion until the morning of August 15, 2016. Nevertheless, on August 16, 2016, the Court granted the Motion to Continue [42][43] and continued the trial date to September 12, 2016.

Attorney Robert McDuff ("McDuff") entered his appearance in this case on August 26, 2016, eighteen days before the trial date. Less than a week later, on September 1, 2016, McDuff filed a second Motion to Continue [69] on behalf of Linda, less than two weeks before trial. On September 2, 2016, Ross filed her Motion to Withdraw as Attorney [72].

The Court issued its rulings on these motions on September 8, 2016.[7] In its Order [81] denying the Motion to Withdraw as Attorney [72], the Court found that Ross had not shown good cause as to why she should be allowed to withdraw from the case. (*See* Order [81] at pp. 3-4.) In its Order [82] denying the Motion to Continue [69], the Court found, in light of the multiple continuances already granted in the case, that Linda's purported reasons for a continuance did not warrant such an action.[8]

---

[6] Charles filed his Notice of Joinder [43] that same day.

[7] On that same date, the Court also issued rulings on the multiple motions *in limine* [47][48][49][50] filed on behalf of the Government and Charles.

[8] Linda gave two reasons: (1) an official review of the investigation by DOJ and (2) the need for her attorney to prepare. The Court did not find these reasons persuasive because (1) there was no proof of an official review by DOJ and (2) McDuff entered the case with full knowledge of the impending trial date and when Linda was already represented by two other attorneys.

On September 9, 2016, counsel for John Lee filed a Motion to Quash Trial Subpoena and Rule 17 Subpoena [84] on his behalf. Because this motion pertained to documents[9] subpoenaed for the trial, the Court continued the trial by one day and heard arguments pertaining to this motion on September 12, 2016. The Court ultimately denied the motion.

Trial began on September 13, 2016. Due to the high local interest in the case, the Court took the precaution of calling for a district-wide venire instead of a division-wide one, in order to ensure the Defendants would be tried before an unbiased panel.

The government rested its case on September 15, 2016, after presenting several witnesses and exhibits. Defense called one witness and rested that same day. After deliberations, the jury returned a verdict of guilty for Charles on Counts 2-10 and for Linda on Counts 6-10. Both Defendants were found not guilty as to Count 1. The jury was unable to reach a verdict as to Counts 2-5 with respect to Linda Bolton, and the Court declared a mistrial as to those counts.

On September 28, 2016, Charles filed his Motion for a Judgment of Acquittal and the Conditional Grant of a New Trial or, Alternatively, Motion for a New Trial [118], and Linda filed her Motion for a Judgment of Acquittal or, in the Alternative, for a New Trial [119] a day later on September 29, 2016. Both motions were fully briefed, and the Court entered its Order [127] denying them both on November 4, 2016.

Sentencing was originally set for December 19, 2016. On that date, Attorney Owen, counsel for Charles, and counsel for the Government requested an in camera meeting with the Court and made a joint request for a continuance, citing Charles's willingness to cooperate with the Government in connection with ongoing investigations. Linda made no objection to this

---

[9] The motion also pertained to a subpoena to testify, which the Government agreed not to enforce owing to the fact that it knew John Lee would only invoke the Fifth Amendment if called to the witness stand and owing to John Lee's health issues.

continuance. The sentencing was then continued to January 18, 2017. Owen and counsel for the Government contacted the Court again on January 13, 2017, requesting the Court to continue the sentencing once more to allow Charles more time to speak with agents of the Government. Sentencing was then continued to February 3, 2017, again with no objection from Linda.

On January 20, 2017, during the time Charles was supposedly actively cooperating with the Government and being represented by Owen, an affidavit was signed by Carl Nicholson ("Nicholson") with a heading bearing the style of this case, detailing John Lee's purported involvement with Owen. (*See* Nicholson Affidavit [177-3].)

On January 24, 2017, because of internal scheduling conflicts of the Court,[10] sentencing was continued once again, with the consent of the parties, and set for March 17, 2017.

On March 15, 2017, Owen filed his Motion to Deem Attorney-Client Privilege Waived [151], stating that Charles had terminated his representation and was now attempting to allege Owen had conducted himself unethically during his representation of Charles. At the time, Charles was also represented by Robert Nathan Udashen ("Udashen"), who represented that he would not be present for the sentencing hearing as his representation was for the appeal phase only, and Samuel S. McHard ("McHard"), who served as local sponsoring counsel for the *pro hac vice* admission of Udashen and who also did not intend to attend the sentencing hearing. The Court learned through the filings connected with Owen's motion that Charles had apparently hired Alabama Attorney Willie J. Huntley ("Huntley") some time during the prior week and that Huntley intended to represent Charles at the sentencing hearing. Despite these intentions, Huntley had not

---

[10] The undersigned was the presiding judge over a case pending in the Northern District of Texas, which was set for a three-week trial in February.

entered an appearance in the Court and had not filed a motion for *pro hac vice* admission, as required by an out-of-state lawyer not licensed to practice in Mississippi.[11]

On March 17, 2017, prior to the sentencing hearing, the Court heard in camera arguments as to the Motion to Deem the Attorney-Client Privilege Waived [151].[12] During these arguments, the Government represented to the Court that Charles, despite his promises to cooperate, had given its agents no useful information despite the continuances of sentencing granted by the Court and that, as a result, it was ready to move forward with the sentencing with no further delay. Despite his previous termination of Owen's representation, Charles allowed Owen to represent him at the sentencing hearing as he had no other counsel present[13] and did not wish to utilize the Federal Public Defender.[14]

After the in camera arguments, the sentencing hearing was held in open court. Over the objections of the Defendants, the Court adopted the Pre-Sentence Reports' calculated sentencing guideline range of 27 to 33 months for both Charles and Linda. The Court then sentenced Linda to 30 months confinement per count with the Federal Bureau of Prisons ("BOP"), to be served concurrently. Charles was sentenced to 33 months confinement as to Counts 2 through 5, to run concurrently, and 12 months confinement for Counts 6 through 10, to run concurrently with each other but consecutively with the 33-month sentence under Counts 2 through 5, for a total of 45 months confinement in the custody of the BOP.[15] Fines and restitution were also levied against

---

[11] In fact, despite the Court allowing him to appear unofficially on behalf of Charles at the sentencing hearing, Huntley did not move to appear *pro hac vice* until March 29, 2017.

[12] These arguments were heard on the record.

[13] As previously stated, Huntley was allowed to unofficially appear on behalf of Charles despite not being properly admitted as *pro hac vice* counsel.

[14] As a precautionary measure, the Court had requested the presence of an attorney from the Federal Public Defender's Office be present at the sentencing hearing and in the in camera hearing, to allow Charles an additional option for the sentencing hearing.

[15] This was an upward variance from the sentencing guideline range, which the Court imposed because of Charles's position as a public official and for other reasons stated in open court.

both Defendants. Judgment was entered in the case on March 28, 2017. (*See* Judgments [165][166].) Defendants were allowed to self-surrender to the custody of the BOP as notified by the U.S. Marshal, but no later than 60 days from the date of sentencing.

Huntley and his associate, Attorney Dennis James Knizley ("Knizley") were admitted *pro hac vice* on March 29, 2017. On March 30, 2017, Margaret W. Holmes ("Margaret")[16] entered an appearance on behalf of both Defendants. On March 31, 2017, Knizley filed a Notice of Appeal [172] on behalf of Charles. Subsequently, on April 3, 2017, Huntley requested that Notice of Appeal be dismissed without prejudice, as it was filed in error. The Court granted this request that same day. (*See* Order [174].)

On April 11, 2017, Huntley filed Charles's First Motion for New Trial [175] and Charles's Second Motion for New Trial [177]. That same day, Huntley filed a Notice of Appeal [180] on Charles's behalf, despite knowledge that, under Federal Rule of Criminal Procedure 33, a pending appeal took away the Court's authority to grant any motion for a new trial based on new evidence.

Also on April 11, 2017, Attorney Ursula K. Mitchell ("Mitchell") entered an appearance on behalf of Linda, and Attorney Sharon Denotra Henderson ("Henderson") entered an appearance on behalf of Charles. Mitchell then filed Linda's First Motion for New Trial [178], while Henderson filed Charles's Third Motion for New Trial [181]. That same day, Attorney McDuff filed a Notice of Appeal [182] on behalf of Linda, again despite knowledge that an appeal divested the Court of authority to grant the motions for a new trial previously filed on behalf of his client.

The Court issued an Order [183] on April 12, 2017, terminating all pending Motions for New Trial [175][177][178][181], finding that it did not have jurisdiction over the matters they involved. *See United States v. Hitchmon*, 602 F.2d 689, 692 (5th Cir. 1979) *superceded by statute*

---

[16] Margaret is the daughter of the previously disqualified Holmes, and works at the Holmes Law Firm.

*on other grounds as stated in United States v. Martinez*, 763 F.2d 1297, 1308 (11th Cir. 1985) (citations omitted); *see also* Fed. R. Crim. 33(b)(1) ("If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.")

On April 21, 2017, Defendants filed their Motions to Seal [189][190],[17] asking for leave to file certain confidential medical information under seal for purposes of forthcoming motions to stay the Defendants' self-report dates. The Court entered its Order [191] granting these motions on April 24, 2017.[18] Defendants' Motions to Stay [198][199] were subsequently filed on April 26, 2017.

The Court learned on April 26, 2017, that Defendants had filed motions for bail pending appeal in the Fifth Circuit.[19] These motions were procedurally incorrect, as motions for bail pending appeal must first be filed with the district court before they are brought to the appellate court, and no such motions were filed with this Court. *See* Fed. R. App. P. 9(b); *see also Jago v. U.S. Dist. Court, N. Dist. of Ohio*, 570 F.2d 618, 623 (6th Cir. 1978) ("Release pending an appeal must be first sought in the district court even after an appeal has been noted from the judgment of conviction."). Because of the confusing motion practice of Defendants and because it was uncertain how to proceed on the Motions to Stay [198][199] given the motions for bail, the Court consulted with staff attorneys at the Fifth Circuit.

---

[17] These motions were entitled "Motion to Stay Self-Report Date," but the event chosen when filing these documents was "Motion to Seal." The Court interpreted them, not as motions to seal, but as motions for leave to file under seal, as that was the relief asked for in the motions.

[18] The Motions to Seal [189][190] were filed on a Friday, and the Court was unable to address them until the following Monday.

[19] Also on April 26, 2017, adding to the confusion of the case, yet another attorney, William Walter ("Walter"), made an appearance on behalf of both Defendants. Three days later, on April 28, 2017, Mary Lee Holmes made an appearance on behalf of both Defendants as well.

It was ultimately decided that the best course of action was for the Court to request a remand pursuant to Federal Rule of Appellate Procedure 12.1(b),[20] in order to streamline the proceedings and to allow for factual findings to be made on the issues in all of the motions filed by Defendants. The Fifth Circuit panel issued a per curiam order remanding the case on April 27, 2017, divesting itself of jurisdiction and denying all pending motions before it as moot. (*See* Order of USCA [205].) The Court issued an Order [206] on April 27, 2017, reviving the Motions for New Trial [175][177][178][181] and setting briefing deadlines. Because of the remand, no appeal is currently pending in this case.

The Court denied the Motions to Stay [198][199] on May 1, 2017. That same day, Defendants filed their Motions for Bond [214][218][21] and asked for expedited consideration of these motions, which the Court denied. Linda surrendered to the custody of the BOP on May 2, 2017, and Charles surrendered on May 3, 2017.

Charles's Fourth Motion for New Trial [226] was filed on May 3, 2017, and Linda's Second Motion for New Trial [231] was filed on May 6, 2017.

The Court denied Defendants' Motions for Bond [214][218] on June 28, 2017. All of the Motions for New Trial [175][177][178][181][226][231] have been fully briefed and the Court is now ready to rule.

## II.  STANDARD OF REVIEW

All but one of the Motions for New Trial [175][177][178][181][226][231] are styled as motions to vacate or, in the alternative, for a new trial under Federal Rule of Criminal Procedure

---

[20] Federal Rule of Appellate Procedure 12.1(b) allows a district court to request remand in order to consider a motion that "raises a substantial issue."

[21] Charles's Motion for Bond [218] was incorrectly filed as a motion for new trial, but it was styled as a motion for bond and that is how the Court analyzed it.

33(b) based on new evidence.[22]  The only avenue for a motion to vacate for a prisoner in federal

custody is through a motion under 28 U.S.C. § 2255.  Motions under § 2255 are collateral attacks

on a federal conviction which may not be heard "until [the conviction] has been affirmed on direct

appeal."  *Fassler v. United States*, 858 F.2d 1016, 1019 (5th Cir. 1988) (citing *Jones v. United

States*, 453 F.2d 351, 352 (5th Cir. 1972)).  Because Defendants' convictions have not been

affirmed on direct appeal, the only relief the Court can consider is under Rule 33(b) for a new trial

based on new evidence.

"Motions for new trial based on newly discovered evidence are disfavored and reviewed

with great caution."  *United States v. Wall*, 389 F.3d 457, 467 (5th Cir. 2004) (quoting *United

States v. Erwin*, 277 F.3d 727, 731 (5th Cir. 2001)) (internal quotations omitted).  There are five

prerequisites, referred to as the "*Berry* rule," that must be met for a new trial to be granted based

on new evidence:

> (1) the evidence is newly discovered and was unknown to the defendant at the time
> of trial; (2) the failure to detect the evidence was not due to a lack of diligence by
> the defendant; (3) the evidence is not merely cumulative or impeaching; (4) the
> evidence is material; and (5) the evidence if introduced at a new trial would
> probably produce an acquittal.

*Id.*

As a preliminary matter, the Court would state that Defendants have failed to introduce any

new evidence that satisfies the *Berry* rule, nor do they even attempt to argue that this standard is

met.[23]  Furthermore, many of Defendants' arguments are duplicative of each other, and most

contain flagrant misrepresentations of the record.  Some of the allegations in Defendants' motions

---

[22] Charles's First Motion for New Trial [175] is simply styled as a motion for new trial, without reference to the
applicable rule of procedure.
[23] Though Defendants refer often to "new evidence" in their motions, they display an utter disregard to Fifth Circuit
precedent as to what actually qualifies as "new evidence" under Rule 33(b).

even cross the thin line between flagrant misrepresentation and blatant lie.[24]  At least three of these motions [175][178][181] should rightfully be stricken under Local Criminal Uniform Rule 47(E) for exceeding the page limit of such motions without obtaining leave from this Court.  The only reason the Court has not done so is because it finds it necessary to address the misrepresentations contained in those motions in order to give clarity to any reviewing court, whether on direct appeal or collateral review.

## III.  CHARLES'S FIRST MOTION FOR NEW TRIAL [175]

Charles's First Motion for New Trial [175] raises only two issues:  Owen's alleged conflict and Owen's deficiency as counsel for failure to call certain witnesses to the stand.  These issues are addressed in more detail below, *see infra* IV.  For the same reasons, this motion will be **denied**.

## IV.  CHARLES'S SECOND MOTION FOR NEW TRIAL [177]

### A.    Owen Conflict of Interest

Most of Charles's arguments stem from what he contends is a conflict of interest his attorney Owen had in his representation of Charles.  Charles contends that this conflict arose because Owen's attorney fees were paid by John Lee, who he calls a "key Government witness." (*See* Charles's Second Motion for New Trial [177] at pp. 5-6.)

Before the Court addresses this alleged conflict, it must first point out this first lie by Defendants that is featured prominently throughout all the motions currently pending before the Court.  Not only was John Lee *not* a "key Government witness," John Lee was never even a witness at trial and no subpoena to testify was ever enforced against him, as all parties were aware that he would only invoke the Fifth Amendment if called to the witness stand.[25]   No testimonial

---

[24] The Court has not ruled out sanctions under its inherent powers for these falsehoods against the attorneys involved.
[25] Defendants were allowed and did in fact comment on John Lee's invocation of the Fifth Amendment.

statements[26] from John Lee were introduced at trial,[27] and the Court specifically ruled that any such statements would be inadmissible as hearsay in violation of both the Federal Rules of Evidence and the Sixth Amendment Confrontation Clause. (*See* Trial Transcript Vol. II [149] at 332:12-333:13.) With that point addressed, the Court moves to Owen's representation of Charles, beginning in August 2014.

Owen was first contacted regarding possibly representing Charles Bolton in August 2014, when Charles's brother, Terrell Bolton, called his office. (*See* Call List [276-2] at p. 1.) Owen met with Charles at his law office on September 3, 2014, to discuss Owen representing Charles, who was under investigation at the time for the theft of food from the Forrest County Sheriff's Office (the "FCSO") and the Adult and Youth Detention Center (the "Detention Center"). (*See* Owen Memo. in Response [277] at pp. 10-11.) Owen agreed to represent Charles in the food theft case and stated that he would further advise him on his fee structure. (*See id.* at p. 11.) Owen sent an email to Charles with the fee structure on October 24, 2014, stating that the fixed retainer fee for his representation was an initial $75,000, and if an indictment were returned, an additional $50,000 would be owed four weeks prior to trial or an additional $10,000 would be owed if, four weeks before the trial date, it was apparent that there would be no trial.[28] (*See* Oct. 24 Email [276-5]; *see also* Owen Memo. in Response [277] at p. 12.)

On October 22, 2014, Charles informed Owen about a scheduled meeting with the U.S. Attorney's Office of the Southern District of Mississippi (the "Mississippi USAO") and directed

---

[26] John Lee's business records, which are non-testimonial in nature, were admitted into evidence by stipulation of parties.

[27] Including any statements John Lee made to investigators, which were included in the PSR and considered by the Court only at sentencing, as the hearsay rules and Confrontation Clause do not apply at sentencing.

[28] Owen's email represented that this was "significantly less" than what he typically charged. (*See* Oct. 24 Email [276-5].)

him to consult Dukes[29] about the meeting, which Owen did. (*See* Emails [276-4]; Owen Memo. in Response [277] at p. 11.) Owen and an associate with his office, along with Dukes, Holmes,[30] John Colette,[31] and an associate from Dukes's office, attended this meeting with the Mississippi USAO on October 27, 2014. (*See* Owen Memo. in Response [277] at pp. 12-13.) During this meeting, the Mississippi USAO "presented an abbreviated, but fairly detailed version of the facts supporting the Government's claim" against the Defendants in the food theft case, which had "zero connection to John Lee." (*Id.* at p. 13; *see also* Ballard Affidavit [276-16] at ¶ 5.) Charles has not claimed at any time that John Lee had an interest in the food theft case.

The Mississippi USAO contacted all attorneys after this meeting seeking clarification on the representation of Charles, as Dukes could not represent Charles because of conflicts with his representation of the FCSO and the Detention Center. (*See* Oct. 27 Letter [276-6].) On October 19, 2014, the Mississippi USAO transmitted a plea offer to Owen, which was communicated to Charles and ultimately turned down. (*See* Plea Email [276-14]; Jan. 9 Email [276-15].)

On November 3, 2014, Charles called Owen and advised that he had made arrangements to pay his retainer fee. (*See* Owen Memo. in Response [277] at p. 14; Nov. 3 Call List [276-7].) On November 5, 2014, Charles, accompanied by no other person, met with Owen at his law office and presented him with three checks totaling $60,000. (*See* Owen Memo. in Response [277] at pp. 14-15; Nov. 5 Calendar [276-8]; Ballard Affidavit [276-16] at ¶ 3.) One of these checks was from Nicholson[32] in the amount of $25,000 and dated November 3, 2014, one was from John Lee

---

[29] Dukes is the disqualified counsel for Linda in this case, and Owen was uncertain as to Dukes's connection to the food theft case at the time.

[30] Holmes is also a disqualified counsel for Linda in this case, and his involvement with the food theft case remains unclear.

[31] John Colette is a criminal defense attorney well-known to the Court, and was previously involved in this case on behalf of Holmes and Dukes after the Government moved to disqualify them.

[32] Nicholson states in his Affidavit [177-3] that this money was given to him by John Lee because "he did not want his office manager to know all of his personal activities." (Nicholson Affidavit [177-3] at p. 2.)

in the amount of $25,000 and dated November 5, 2014, and one was from Southern Neurologic & Spinal Institute for $10,000 and dated October 31, 2014. (*See* Checks [276-9]; *see also* Checks [177-3][181-3].) Charles told Owen "that he obtained loans from friends and had the checks made payable to Owen" and that "he would make arrangements to obtain the additional $15,000.00 payment in due course."[33] (Owen Memo. in Response [277] at p. 15.) At no point before or after November 5, 2014, did Owen or any member of his firm "meet with, converse with or have any contact with John Lee concerning the money Charles Bolton borrowed from John Lee or about the food theft case." (*Id.* at p. 16; *see also* Ballard Affidavit [276-16] at ¶ 4.) Charles has not alleged any specific contact between John Lee and Owen. Rather he relies on statements that "John Lee made payments to Attorney Owen for attorney fees with funds controlled by Lee" without mentioning that these payments were made *through* Charles himself,[34] who personally delivered the checks to Owen's law office and who represented that they were "loans from friends." (Charles's Second Motion for New Trial [177] at p. 6; Owen Memo. in Response [277] at p. 15.)

Owen transmitted Charles's denial of the plea offer on January 9, 2015. (*See* Jan. 9 Email [276-16].) To the Court's knowledge, no further activity has occurred in the food theft case and no indictment was ever filed against Charles or Linda.

Owen was first given notice of the Indictment [1][2] in this case on March 23, 2016,[35] the day after it was filed. (*See* Owen Memo. in Response [277] at p. 17.) Neither Charles nor Owen knew about the tax investigation or indictment until this time. (*See id.* at p. 18.) The tax indictment was filed by the U.S. Attorney's Office for the Eastern District of Louisiana (the "Louisiana

---

[33] The remaining portion of the retainer fee was never paid to Owen. (*See* Owen Memo. in Response [277 at p. 18.)
[34] Charles does not dispute that he gave the checks to Owen himself.
[35] At the time, Charles was involved in a civil trial before this Court, of which Owen had no knowledge and in which Owen was not involved.

USAO") and was unrelated to the potential charges in the food theft case.  (*See* Owen Memo. in Response [277] at p. 19; *see also* Indictment [1][2].)

Owen took up the representation of Charles in this case under the same fee structure as he previously detailed and, because no indictment was filed in the food theft case and as a gesture of good will, gave Charles credit for the fees already paid in the previous case and only charged a fee of $65,000 for his representation in the tax case, plus expenses.[36]  (*See* Owen Memo. in Response [277] at p. 19; *see also* Ballard Affidavit [276-16] at ¶ 3.)  Of this $65,000 fee, only $35,000 was paid:  $2,500 from Charles Bolton on April 21, 2016, $2,500 from C. T. Finnegan/Bolton on April 21, 2016, $5,000 from Frazier Bolton on June 14, 2016, and $25,000 from Linda Bolton on August 29, 2016.  (*See* Client Settlement Trust Report [276-10].)  With litigation expenses totaling $38,000 in relation to the tax case, Charles still owes Owen and his firm approximately $58,000 in fees and expenses.  (*See* Owen Memo. in Response [277] at p. 19; Ballard Affidavit [276-16] at ¶ 3.)

With this history of Owen's representation of Charles and his fee arrangement before it, and with no allegation of any actual contact between Owen and John Lee, the Court can find with certainty that Owen had no conflict of interest in this case based on any payment made by John Lee for Charles's legal fees.

Even assuming *arguendo* that such a conflict did exist, the Court is at a loss as to how this could possibly be new evidence to qualify for a new trial under Rule 33(b).  Although he never raised the issue with the Court until he filed his First Motion for New Trial [175],[37] Charles knew

---

[36] Owen stresses that he was in no way obligated to give Charles this credit and that it was a "gratuitous benefit."  (*See* Owen Memo. in Response [277] at p. 19.)
[37] Owen himself brought the allegations of a conflict to the Court's attention in his Motion to Deem the Attorney-Client Privilege Waived [151].  Charles has *never* raised the issue of his own initiative until the subject motions were filed.

that he borrowed money from John Lee to pay his legal fees in 2014 for the food theft case *when he gave the check from John Lee to Owen* **in 2014**. So the evidence was not unknown to him as required by the first prong of the *Berry* rule, and cannot be the basis for a new trial under Rule 33(b). *See Wall*, 389 F.3d 467. The Court will **deny** his motion under his conflict argument.

### B.     Ineffective Assistance of Counsel

Charles argues that, because Owen had a conflict of interest due to John Lee's payment of his legal fees, he provided ineffective assistance of counsel. This argument unravels with the Court's determination that Owen had no such conflict of interest. The Court would also be remiss if it did not comment on the irony of this claim, as Owen's representation was so effective that he was able to negotiate a plea bargain with the Government on Charles's behalf, which would have significantly reduced his sentencing guideline range and put probation potentially within his reach. (*See* Galloway Affidavit [276-1] at ¶ 7.) Because Owen could not guarantee probation, however, Charles turned this offer down, as was his right. (*See id.*)

Furthermore, the Fifth Circuit has held that "a Rule 33 motion . . . premised on 'newly discovered evidence,' is an improper vehicle for raising a claim of ineffective assistance of counsel." *United States v. Medina*, 118 F.3d 371 (5th Cir. 1997) (per curiam) (citing *United States v. Ugalde*, 861 F.2d 802, 807-09 (5th Cir. 1988)). In *Ugalde*, the Fifth Circuit reasoned that allowing such claims under Rule 33 would "greatly expand the opportunities to make a late request for a new trial" and noted that "defendants prejudiced by ineffective assistance of counsel" already have a "ready remedy" in 28 U.S.C. § 2255. 861 F.2d at 809. Therefore, the Court must **deny** his motion under this argument.

Even if Charles *could* bring an ineffective assistance of counsel claim under a Rule 33(b) motion for new trial based on new evidence, he has woefully failed to bring a meritorious claim.

All of Charles's arguments are based on misrepresentations of the record, an almost willful misunderstanding of the law, or a combination of both.

The standard for ineffective assistance of counsel claims is found in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984). The *Strickland* test requires that two prongs be met before assistance of counsel is found to be deficient. *Id.* at 687. First, counsel's performance must be shown to be deficient. *Id.* "To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness'" as established by "prevailing professional norms." *Wiggins v. Smith*, 538 U.S. 510, 521, 123 S. Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting *Strickland*, 466 U.S. at 688, 104 S. Ct. 2052). Such scrutiny of counsel's performance is "highly deferential." *Strickland*, 466 U.S. at 689, 104 S. Ct. 2052. Second, counsel's performance must have prejudiced the defendant. *Id.* at 687. To establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S. Ct. 2052.

### 1.    Failure to Request a *Garcia* Hearing

A *Garcia* hearing is typically held when "a defendant chooses to proceed with representation by counsel who has a conflict of interest" in order for the district court "to ensure a valid waiver by the defendant of his Sixth Amendment right." *United States v. Garcia-Jasso*, 472 F.3d 239, 243 (5th Cir. 2006) (citations omitted). A *Garcia* hearing is only necessary "if there is an actual conflict of interest." *Id.* (quoting *United States v. Carpenter*, 769 F.2d 258, 263 (5th Cir. 1985)).

The Court only became aware of a potential conflict of interest when Owen filed his Motion to Deem the Attorney-Client Privilege Waived [151], in which Owen represented that he only a

few days prior had any notification that Charles was alleging that he, Owen, had a conflict of interest in this case. After the in camera hearing held on March 17, 2017, the Court was not convinced that an actual conflict existed, and after the extensive briefing on the current motions, it is still not convinced that any actual conflict exists. *See supra*, IV.A. The Court does not find Owen's performance here deficient as there was no actual conflict mandating a *Garcia* hearing and, even if there were, Owen brought it to the Court's attention as soon as he learned about the allegation of a conflict.

### 2.    Failure to Call Nicholson

Charles claims Owen's performance was deficient in failing to call Nicholson as a witness in his defense. To establish Owen was ineffective based on his failure to call a witness, Charles "must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (citing *Bray v. Quarterman*, 265 F.App'x 296, 298 (5th Cir. 2008)). Charles has failed to set out what Nicholson would have testified to at trial[38] or that such testimony would have been favorable to him. Furthermore, "the initial defense strategy of Owen, Galloway and OGM was to aggressively challenge Nicholson & Co., particularly Carl Nicholson" and to "lay the blame for the indictment at the feet of Nicholson," a strategy to which Charles objected. (Owen Memo. in Response [277] at p. 10.) Moreover, Owen was of the opinion that Nicholson "may be considered by the Government as a possible co-conspirator" and "would be subjected to grueling cross examination" if called. (*Id.* at p. 22.) Owen also states that "[t]here were other secondary factors

---

[38] Though Nicholson states in his affidavit that he would have testified at trial, despite having pleaded the Fifth Amendment when he testified before the Grand Jury in connection with John Lee, he at no point details what his testimony would have been. (*See* Nicholson Affidavit [177-3].)

that play[ed] into a decision to call Carl Nicholson, such as credibility, reputation in the community and any prior arrest/convictions,"[39] and that it "would have been imprudent to call Nicholson as a witness" even "[a]side from the very important fact Nicholson would have invoked protection from self-incrimination under the Fifth Amendment," as he "would have encountered damaging cross examination on several issues." (*Id.* at p. 23.) As such, the Court does not find that Owen was deficient in his performance for failing to call Nicholson as a witness.

### 3. Failure to Object to Lee's Attorney's Participation at Trial

Charles claims that Owen's representation was deficient for not objecting to the participation of John Lee's attorney at trial. This argument is based on the assertion that John Lee's attorney participated at trial, an assertion which is patently false. The only proceeding in which John Lee's attorney participated was John Lee's own third-party Motion to Quash Trial Subpoena and Rule 17 Subpoena [84], which the Court heard before trial began and to which Owen could not have raised any meritorious objection. Therefore, Owen's representation was not ineffective under this argument.

### 4. Failure to Refute Lee's Checks as Income

Charles argues that Owen's performance was deficient because he failed to call witnesses and offer testimony to refute the claim that John Lee's checks were income to the Defendants. Charles also claims that sales records from a different liquor store, 27th Avenue Liquor Store, should have been introduced at trial to show John Lee's alcohol purchases were not from the Defendants' liquor store, Hall's Avenue Package Store. Because Charles's second argument is

---

[39] Though Owen does not elaborate on Nicholson's prior arrests and convictions, the Court is well-aware of Nicholson's criminal history, including his arrests for disorderly conduct, public drunkenness, and public profanity, as well as his plea of guilty on the disorderly conduct charge. The Court is also aware that these arrests were highly publicized in the Hattiesburg area. *See Nicholson v. Garmon, et al.*, Civ. Action No. 2:16-CV-152-KS-MTP, Docket No. 21 (S.D. Miss. Oct. 7, 2016).

contrary to actual fact, as the records of 27th Avenue Liquor Store *were* entered into evidence at trial, (*see* Exhibit DC-76 [184-76]), the Court analyzes only his first argument as to witnesses not called.

As previously stated, to succeed on such a claim, Charles "must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Day*, 566 F.3d at 538 (citing *Bray*, 265 F.App'x at 298). The only witness named by Charles is Maggie Hancock, who was an employee of Defendants' restaurant and who in her affidavit states that she was available to testify and would have testified that, during her employment, she "never catered a party or event whatsoever for John Lee, P.A. at his office or his residence."[40] (Hancock Affidavit [177-10] at ¶ 6.) The Court assumes Charles's argument is that this testimony would have been favorable to his defense that the John Lee checks were not income.[41]

Owen, on Charles's behalf, has three times argued that the John Lee checks were not proven to be income to the Defendants at trial—first at trial, (*see* Trial Transcript [150] at 405:18-413:24, 506:16-510:15.), second in his Motion for New Trial [118] and third in his Joinder [140] to Linda's Renewed Motion for New Trial Based on New Information [128]. The Court has three times rejected this argument, finding that the Government had presented sufficient evidence that these checks were income to Defendants, and has twice ruled that even if Defendants had

---

[40] Ms. Hancock does not purport to have any knowledge as to whether John Lee purchased alcohol from Hall Avenue Package Store.

[41] The Court does not understand the insistence of Defendants in continually advancing this defense as, under their arguments, they contend that the John Lee checks were not income to them but rather part of a scheme in which they aided John Lee in evading taxes by cashing checks made out to their businesses and returning the money to him. Such a scheme, however, would also be criminal in nature, meaning Defendants are attempting to defend one crime by arguing that they committed a different crime.

completely succeeded in showing that the John Lee checks were not income, there was still sufficient evidence of unreported income to support their convictions. (*See* Trial Transcript [150] at 416:5-421:8; Order [127] at p. 3; Order [145] at pp. 3-4.) To reiterate the argument here in his Second Motion for New Trial [177] is yet another futile attempt by Charles to misrepresent the evidence which was brought against him at trial. Besides the fact that the Government produced sufficient evidence at trial to show that the John Lee checks were income, (*see* Trial Transcript [150] at 416:5-421:8), the Government has also produced checks, claimed as loans by Defendants, written to either Sports 22 Restaurant or Hall Avenue Package Store by Manheim Mississippi Auto Action, the Mississippi Air National Guard, Forrest General Hospital, Linda's former attorneys, Holmes and Dukes, and, incredibly, a Sports 22 customer, who wrote a check for $8.75 to pay for a fish dinner, which were undoubtedly shown to be income. (*See* Trial Transcript [148] at 106:12-107:23; Exhibit G-75 [188-75]; Exhibit G-78 [188-78]; Exhibit G-80 [188-80]; Exhibit G-82 [188-80]; Exhibit G-84 [188-84].)

Because Owen did in fact argue and present evidence that John Lee's checks were not income and because, even if he had failed to do so, this defense would have proven ultimately ineffective, the Court cannot find that his performance was deficient under this argument.

### 5.   Failure to Present Alternate Theories

Charles argues that Owen should have presented alternate defense theories. In addition to the already-discussed theory that John Lee's checks were not income, Charles contends that Owen should have advanced a theory that "loaning capital back to the business as loans (as was the case with Charles and Linda Bolton) is not a crime under the income tax evasion and filing a false tax return statutes," citing *Boulware v. United States*, 552 U.S. 421, 128 S. Ct. 1168, 170 L.Ed.2d 34 (2008), in support of this defense.

First of all, this argument is in no way supported by the Supreme Court's decision in *Boulware*. That case dealt with allegedly unreported income to the defendant from a corporation to which he was a shareholder, and the defendant argued that the alleged income was actually a return of capital, and not a dividend as the government contended. *Boulware*, 552 U.S. at 426-28, 128 S. Ct. 1168. *Boulware* does not in any way make any comment on the tax treatment or criminal tax liability of capital contributions, as the Defendents contend the checks marked as loans in this case were. Rather, *Boulware* dispenses with the rule that "a criminal defendant may not treat a distribution as a return of capital without evidence of a corresponding contemporaneous intent" on the part of the corporation. 552 U.S. at 430-31, 128 S. Ct. 1168. This has no impact on Defendants' case, however, as they do not claim that any of the unreported income is a return of capital.

Defendants do, however, argue that the checks marked as loans were "capital contributions" that were exempt from taxation. This is yet another misunderstanding of the law on Defendants' part. Contributions of capital are exempt from income of a *corporation* under 26 U.S.C. § 118. Neither Sports 22 Restaurant nor Hall Avenue Package Store is a corporation, however, but rather both are Schedule C businesses claimed on Defendants' joint individual tax returns. Defendants have pointed to no section of the tax code to exempt capital contributions from the income of Schedule C businesses.[42]

Furthermore, even if Schedule C businesses could exempt capital contributions from their income, there are certain requirements of capital contributions given by non-owners, which would be the case here as the checks marked as "loans" were written, not by either Charles or Linda, but by third-parties. To be a capital contribution by a non-owner:

---

[42] The equivalent to capital contributions to Schedule C businesses would be loans from either the owners of the business or from third parties, which would not generally be considered taxable income.

[1] It certainly must become a permanent part of the transferee's working capital structure. [2] It may not be compensation, such as a direct payment for a specific, quantifiable service provided for the transferor by the transferee. [3] It must be bargained for. [4] The asset transferred foreseeably must result in benefit to the transferee in an amount commensurate with its value. [5] And the asset ordinarily, if not always, will be employed in or contribute to the production of additional income and its value assured in that respect.

*AT&T, Inc. v. United States*, 629 F.3d 505, 513 (5th Cir. 2011) (quoting *United States v. Chicago, B. & Q. R. Co.*, 412 U.S. 401, 413, 93 S. Ct. 2169, 37 L.Ed.2d 30 (1973)). The unreported income in this case fails to meet the second requirement to be a capital contribution, as these checks marked as loans were shown to be compensation for goods and services of Sports 22 Restaurant and Hall Avenue Package Store.

Finally, despite all the legal reasons why Defendants' claim that these checks were capital contributions fail, the Court must point out that Owen did in fact put forward the argument that these checks were capital contributions. (*See, e.g.*, Trial Transcript [150] at 529:9-530:5; 510:22-511:8.) Owen fully admits that this defense was not presented fully because "the testimony of Linda Bolton was crucial" to it because "Charles claimed he had no knowledge of the deposits marked as loan and was not aware that Linda marked deposits as a loan until after the tax indictment." (Owen Memo. in Response [277] at p. 39.) Linda, who was not Owen's client, exercised her Fifth Amendment right not to testify at trial, despite Owen "implor[ing] Charles Bolton to intervene," which he refused to do. (*Id.*) Since the beginning of this case, Owen had been "emphatic in [his] position that only four people had specific knowledge of these events and only four people could provide the jury with the guidance the jury would need: (1) Charles Bolton; (2) Linda Bolton; (3) John Lee; (4) Nicholson & Co." (Sept. 20 Letter [276-20] at p. 3.) John Lee invoked the Fifth Amendment, and Owen believed that testimony from Nicholson would be damaging to Charles's case. (*See* Memo. in Response [277] pp. 22-23.) The only remaining

witnesses would have been Charles and Linda themselves, who both opted to not testify over Owen's advice, as was their right under the Fifth Amendment.[43]

The Court can find no fault with Owen's representation on this theory, as it was advanced despite being hindered by Defendants' decisions to not testify, decisions which went against Owen's counsel.[44]

### 6.    Failure to Object to Sixth Amendment Violation

Charles claims that Owen was deficient for not objecting to the violation of his rights under the Confrontation Clause of the Sixth Amendment by the admission of John Lee's out-of-court statements at trial.

This argument is based on testimony concerning out-of-court statements made by John Lee to Agent Luker, to which Owen did, in fact, object.  (*See* Trial Transcript Vol. II [149] at 329:8-330:12.)  Furthermore, the Court ruled specifically and in detail that the hearsay rules barred such testimony from Agent Luker.  (*See id.* at 332:12-333:13.)  On cross-examination, Agent Luker stated that the John Lee checks were written for food and liquor and were claimed on John Lee PA's tax return as business supplies.  (*See id.* at 348:12-349:6.)  At trial, all parties agreed that this information was available in John Lee's ledger and check registers, which were admitted by parties' stipulation and, insofar as they may have contained hearsay, were subject to the business records exception of Federal Rule of Evidence 803(6).  (*See id.* at 345:17-348:6.)  As a general

---

[43] Defendants may have had a remote possibility of succeeding on this defense if Linda or Charles would have testified that they relied in good faith on what they mistakenly believed to be the law.  *See generally Cheek v. United States*, 498 U.S. 192, 111 S. Ct. 604, 112 L.Ed.2d 617 (holding that whether an objectively unreasonable belief that a taxpayer had no legal duty under the tax law negated the willfulness element of tax evasion was a question for the jury).

[44] Owen counseled that both Defendants should testify, but when Linda refused, he advised Charles on "the implications of testifying and not testifying" and "conducted several direct and cross-examination simulations before and during trial," during which it was apparent that Charles could not give "a clear explanation regarding Mr. John Lee's cashed checks" and that he "would equivocate regarding the reasons for the cashed checks" if put on the stand. (Galloway Affidavit [276-11] at ¶¶ 5-6; *see also* Ballard Affidavit [276-16] at ¶¶ 14-15; Blum Affidavit [276-22] at ¶ 3; Rhodes Affidavit [276-21] at ¶ 4.)

rule, "business records are not testimonial in nature and their admission at trial is not a violation of the Confrontation Clause." *United States v. Jackson*, 636 F.3d 687, 692 (5th Cir. 2011) (quoting *United States v. Morgan*, 505 F.3d 332, 339 (5th Cir. 2007)). Owen's representation was not deficient under this argument.

### 7. Failure to Object to *Brady* Violations

Charles contends that Owen provided ineffective assistance of counsel for his failure to object to certain *Brady* violations by the Government. Specifically, Charles argues that the Government violated *Brady* by not disclosing the statements of John Lee from an interview investigators had with him and the alleged late disclosure of the Government's summary charts and photographs.

The Court has already ruled in detail that the non-disclosure of John Lee's statements from his interview with investigators was not a *Brady* violation, as those statements were not favorable to the Defendants as required by *Brady*. (*See* Order [145] at pp. 2-4.) The Court cannot find Owen's performance as counsel deficient in some way for failing to object to a non-violation, particularly when he did, in fact, object by joining Linda's Renewed Motion for New Trial [128], which argued unconvincingly that this was a violation of *Brady*.

As for Charles contention that the late disclosure of certain summary charts and photographs introduced by the Government was a *Brady* violation, this argument has absolutely no merit. The summary charts were produced by the Government in April 2016 and supplemented before trial, and the photographs were stipulated to by all parties. A *Brady* violation "occurs when the [Government] fails to disclose evidence materially favorable to the accused." *Banks v. Thaler*, 583 F.3d 295, 310 (5th Cir. 2009) (quoting *Youngblood v. West Virginia*, 547 U.S. 867, 869, 126 S. Ct. 2188, 165 L.Ed.2d 269 (2006)). Even if the summary charts and photographs were untimely

disclosed, a contention for which the Court finds no evidence, they were still undoubtedly disclosed and cannot be the basis for a *Brady* violation, particularly when they are not materially favorable to Defendants. The Court therefore does not find Charles's argument against Owen persuasive here.

### 8. Failure to Object to Government's "False Tax Deficient [sic]"

Charles argues that Owen was ineffective because he failed to object to the Government's "false tax deficient [sic]," but he gives absolutely no support to his allegation that the Government presented "false tax deficient [sic] calculations that the Prosecution Knew [sic] were False [sic]." (Second Motion for New Trial [177] at p. 26) (emphasis omitted). There is nothing in the record but Charles's baseless allegation that the Government's tax deficiency calculations were erroneous, and the Court will not find Owen deficient on such an argument.

### 9. Failure to Research Tax Law

Charles offers two arguments here. First, he states that all the claims against him were barred because the six-year statute of limitations for criminal tax evasion only applies when the gross income omitted exceeded 25 percent of the gross income claimed and because they submitted their records along with their returns documenting their "loans." This is a false statement of the law. The provision cited by Charles, 26 U.S.C. § 6501, deals only with assessment and collection of taxes owed, *not* criminal prosecutions for attempted tax evasion. Additionally, the statute explicitly allows for the collection of past due taxes "at any time" in a case of a "willful attempt to evade tax," as Charles was convicted of here. 26 U.S.C. § 6501(c)(2). The Court cannot say that Owen was deficient in his performance because he failed to willfully misinterpret the law as Charles does in his motion.

Next, Charles argues that Owen was ineffective because he failed to argue against the inclusion of tax year 2009. This argument is premised on the lie that Agent Luker testified that there was no tax deficiency in 2009 and all income tax was properly paid. Agent Luker never offered such testimony. Agent Luker testified that, although he did not include the loans in calculating Defendants' income in 2009 because they were properly reported, he did find that, while Defendants had claimed $31,179 in Schedule C income on their 2009 tax return, the correct amount was $99,379, and that their total income, reported as $79,620, should have been $143,135.10, giving them a tax deficiency of $25,430.13. (*See* Trial Transcript [149] at 279:2-280:5.) The Court will not find Owen ineffective for not making the baseless argument that Agent Luker testified that there was no tax deficiency for 2009 when Agent Luker specifically testified that there *was* a tax deficiency for 2009.

### 10. Failure to Raise 2010 Audit

Charles contends that Owen's representation was ineffective because he did not argue that the charges dealing with the 2010 tax year were barred because Defendants had been audited that year. This audit was based on gambling winnings that were unreported by Charles in 2010 and was explained in detail by Agent Luker at trial, who also explained the divide between the civil and criminal divisions of the IRS. (*See* Trial Transcript [149] at 309:1-23.) Even had Owen offered the argument Charles proposes, the Court would not have found it meritorious, as nothing in the law states that an audit forecloses a later criminal tax investigation.

### 11. Failure to Offer Expert Witness

Charles claims Owen was ineffective because he failed to offer an expert witness to testify. As for any failure to call a witness claim for ineffective assistance of counsel, Charles "must name the witness, demonstrate that the witness was available to testify and would have done so, set out

the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Day*, 566 F.3d at 538 (citing *Bray*, 265 F.App'x at 298). The only expert witness Charles identifies that he claims Owen could have called is Phil Hull. However, the only proposed testimony of Hull is his expert opinion as to the legal sufficiency of the Government's case. (*See* Hull Affidavit [177-8].) These opinions would have been inadmissible legal conclusions at trial. *See United States v. Izydore*, 167 F.3d 213, 218 (5th Cir. 1999) (citing *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983)) (finding that Federal Rule of Evidence 704(a) "does not allow a witness to give legal conclusions). The Court will not find Owen to have been ineffective for failing to offer inadmissible testimony.

### 12. Failure to Challenge Blind Jury Strikes

Charles argues that Owen's assistance was ineffective because he did not object to what Charles calls an "unconventional juror selection process." (Second Motion for New Trial [177] at p. 71.) Charles further alleges that the Court's method of utilizing blind strikes in jury selection "did not meet the provisions under the law to allow sufficient basis to overcome Bastson challenges." (*Id.*) The Court assumes Charles is referring to *Batson* challenges, which allows defendants to object to the exclusion of jurors based solely on their race. This argument is based on a fundamental misunderstanding of the jury selection process utilized by this Court and, as none of the attorneys who filed the current motions were actually present during the jury selection process, is likely premised on Attorney Ross's initial misunderstanding of the process.[45]

Far from being "unconventional," the undersigned implemented the same method of jury selection as he does in any jury trial. The strikes made by both parties were not "blind" in that the

---

[45] Ross was the attorney of record for Linda when the Court relayed the jury selection process to all parties during the pre-trial conference.

identities of the jurors stricken by each side were not made known to all parties once they were made. They were "blind" in the sense that all parties presented their strikes simultaneously, without knowing who the other side was striking. Defendants knew who the Government struck and were given the opportunity to pursue any *Batson* challenge. "The method employed to select juries is committed to the sound discretion of the trial judge." *United States v. Durham*, 587 F.2d 799, 801 (5th Cir. 1979). Owen was not ineffective in his performance for failing to object to this method the Court chose to employ as any objection would have been meritless.

### 13. Failure to Object to Duplicative Charges

Charles argues that Owen should have moved to dismiss the indictment because it impermissibly charged him with duplicative charges. Specifically, Charles claims that Counts 6-10 for violations of 26 U.S.C. § 7206(1) are lesser included charges of Counts 1-5 for violations of 26 U.S.C. § 7201. In support of this, Charles cites case law from multiple courts dealing with § 7201 and § 7203, which is not one of the statutes at issue in this case. Case law involving the correct statutes, § 7201 and § 7206(1), explicitly allows for charges to be brought under both.

> A defendant can be guilty of violating section 7201 without violating section 7206(1) and vice versa because the elements of the offenses are not identical. However, in any particular case, section 7206(1) may not be a lesser included offense within section 7201 because, on the proof offered, the factual elements may be identical.

*United States v. Bender*, 606 F.2d 897, 898 (9th Cir. 1979), *cited with approval by United States v. Barrilleaux*, 746 F.2d 254, 255 (5th Cir. 1984). Because Charles is wrong in his belief that § 7206(1) is a lesser included charge of § 7201, the Court does not find Owen's performance defective under this argument.

### C. Sentencing

Charles raises numerous arguments dealing with his sentencing hearing, none of which could fairly be classified as based on "new evidence" under the *Berry* rule. The Court will address each of them in turn.

### 1. Counsel of Choice

Charles argues that the Court denied him his counsel of choice when it forced him to go forward with the sentencing with Owen as his attorney. This is a gross misrepresentation on Charles's part. The truth of the matter is that Charles, on the date of his sentencing and without giving any notice to the Court that Owen had a potential conflict,[46] appeared before this Court with no attorney present and duly admitted to practice before this Court, in a blatant attempt to force the Court to continue the sentencing hearing. His attorney of choice, Huntley, had been hired a week prior to the sentencing, (*see* Owen Memo. in Response [277] at p. 8; Galloway Affidavit [276-11] at ¶ 9), but had failed to enter a motion to appear *pro hoc vice*, in what the Court can only assume was a calculated tactic aimed at a continuance. The Court cannot and will not allow a convicted defendant to force a continuance of his sentencing hearing because he willfully appears without an attorney. If it did, every convicted defendant would attempt to delay sentencing with the same type of tactic.

Faced with this situation, the Court offered Charles the choice of going forward with the sentencing with Owen as his attorney or utilizing the Federal Public Defender's Office, who, thanks solely to Owen's notification to the Court, had been advised of the situation and was present, willing, and ready to represent Charles if he so chose. Additionally, in an abundance of

---

[46] The only notice the Court had was from Owen himself when he filed his Motion to Deem the Attorney-Client Privilege Waived [151].

caution, the Court allowed Huntley to unofficially represent Charles at the sentencing. The Court did everything within its power to ensure that Charles was fairly represented at his sentencing hearing, despite his deceitful delay tactics.

### 2. Owen's Failure to Respond to PSR and Addendum

Charles contends that Owen failed to submit a sentencing memorandum in response to the PSR. However, Owen did in fact submit objections to the PSR, and argued them before the Court during the sentencing hearing. The Court is unsure what other "sentencing memorandum" Charles believes Owen should have submitted.

Charles also argues that Owen should have objected to the Addendum, but does not state what the objection should have been. The Addendum to the PSR only included penalties and interest, which Owen advised Charles at the time the original PSR was submitted that he could face. (*See* Owen Memo. in Response [277] at p. 34.) Nothing about Owen's performance was deficient here.

### 3. Owen's "Derogatory Statements with Connotations of Violence"

Charles claims that Owen made "derogatory statements with connotations of violence to Chief Deputy Bolton" during the in camera hearing held prior to the sentencing hearing. (*See* Second Motion for New Trial [177] at p. 36.) The Court addresses this allegation specifically, not because it has any merit, but because it shows the absurd inaccuracy apparent throughout his motions. The "derogatory statements" referred to by Charles are Owen's colloquial statements that Charles "shot himself in the foot" by manufacturing a conflict of interest in Owen's representation because Owen was doing everything in his power to assist Charles in reducing his sentence. (In Camera Transcript Excerpt [177-24] at 35:23-24.) To further illustrate his point, Owen continued his analogy by saying that Charles went a step further than the common idiom

because he "blew off both legs" instead of merely shooting himself in the foot. (*Id.*) To charge Owen with making "derogatory statements with connotations of violence" through the use of these banal rhetorical phrases is a gross mischaracterization of the actual events.

### 4.      Owen's Failure to Call McGee as Character Witness

Charles argues that Owen was ineffective at sentencing because he failed to call Sheriff Billy McGee as a character witness at the sentencing. The testimony McGee says he would have given if called as a witness at sentencing is substantially the same as the statements contained in his letter to the Court on behalf of Defendants prior to sentencing, which was duly considered by the Court. (*See* McGee Affidavit [177-32].) To introduce him as a character witness at the hearing would have been redundant and would have not impacted the sentence imposed by the Court.

### 5.      Owen's Failure to Object to *Booker* Violations

Charles argues that his sentence, which was an upward variance from the sentencing guidelines, violated *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L.Ed.2d 621 (2005), and Owen was ineffective at sentencing for not making an objection under *Booker*. This argument once again is premised on Charles's incorrect reading of the law.

*Booker* held that the federal sentencing guidelines were advisory, requiring "a sentencing court to consider Guidelines ranges" but permitting it "to tailor the sentence in light of other statutory concerns as well." 543 U.S. at 245, 125 S. Ct. 738. In *Booker*, the sentencing guideline range was greater than the sentence "authorized by the jury verdict alone." *Id.* at 230. The Court quoted its previous ruling in *Apprendi v. New Jersey*, which set aside an enhanced sentence reasoning that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury." *Id.* at 231 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L.Ed.2d 435 (2000)).

In this case, each conviction under 26 U.S.C. § 7201 allowed for a sentence of up to five years under the statutory provisions, and each conviction under § 7206(1) allowed for a sentence of up to three years. There is no statutory requirement under either § 7201 or § 7206(1) for these sentences to run concurrently. Charles was sentenced to 33 months, or 2.75 years, for his convictions under § 7201, and 12 months, or one year, for his convictions under § 7206(1), both of which are well within the statutory limits. (*See* Judgment [165] at p. 2.) As such, this argument is meritless, and Owen cannot be deficient for failing to make a meritless argument.

### D. "Attorney-to-attorney Conflict"

An "attorney-to-attorney conflict" is, to the Court's best knowledge,[47] a fictitious legal concept presented by Charles in the current motion and in his Third Motion for New Trial [181], and by Linda in her First Motion for New Trial [178]. (*See, e.g.,* Charles's Second Motion for New Trial [177] at p. 71.) Under this fabricated issue, Charles and Linda claim that they were both prejudiced by the disagreement of their attorneys and are therefore entitled to a new trial.

First and foremost, this is not new evidence under the *Berry* rule, as the disagreement between their attorneys was known or should have been known to Defendants, evidence of this disagreement is not material because it would not have made it to a jury, and it would not have probably resulted in an acquittal if presented at trial. *See Wall*, 389 F.3d at 467. Second, if an "attorney-to-attorney conflict" rule were to exist, such a conflict would exist in every case involving multiple co-defendants with adverse interests where lawyers advocated for their clients' respective interests over their co-defendants. Because such advocacy is *encouraged*, there is a strong policy rationale behind the rejection of a so-call "attorney-to-attorney conflict of interest."

---

[47] Defendants cite no legal authority in support of such a concept, and the Court can locate no court, state or federal, from any jurisdiction within the United States, which even mentions the phrase "attorney-to-attorney conflict."

Because Charles's arguments under this issue fail to meet the requirements for a new trial under Rule 33(b), his motion will be **denied** here as well.

## V.  CHARLES'S THIRD MOTION FOR NEW TRIAL [181]

Charles's Third Motion for New Trial [181] is word-for-word identical to his Second Motion for New Trial [177], with only some minor formatting changes.  It will, of course, be **denied** for the same reasons.  Attorney Henderson, the attorney who filed this motion on Charles's behalf, is warned that the Court is considering sanctions against her for such a frivolous filing of a 73-page document.

## VI.  CHARLES'S FOURTH MOTION FOR NEW TRIAL [226]

### A.      Court "Erroneously" Terminated Motions for New Trial

Charles argues that the Court "erroneously" terminated his previous motions for new trial after he filed his Notice of Appeal [180].  (Charles's Fourth Motion for New Trial [226] at p. 1.) In fact, it was Charles who was in error here, as his Notice of Appeal [180] divested the Court of jurisdiction to hear his motions.  *See United States v. Hitchmon*, 602 F.2d 689, 692 (5th Cir. 1979) *superceded by statute on other grounds as stated in United States v. Martinez*, 763 F.2d 1297, 1308 (11th Cir. 1985) (citations omitted); *see also* Fed. R. Crim. 33(b)(1) ("If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.")

### B.      Denial of Motion to Stay was Denial of Bond

Charles also erroneously argues that the Court's denial of his Motion to Stay [198] his report date was a denial of bond pending appeal.  (*See* Charles's Fourth Motion for New Trial [226] at p. 2.)  Charles's Motion for Stay [198], however, did not argue for bond pending appeal but rather for a stay of his report date and cited no legal authority for such a stay.  In fact, Charles did not move for bond pending appeal with this Court until the day the Court's Order [217] denying

his Motion for Stay [198] was filed.[48]  Charles's Motion for Bond [218] was not denied until the Court issued its Order [294] on June 28, 2017, and provided detailed reasoning as to why Charles was not entitled to bond pending appeal.

###### C.    Recusal of U.S. Attorney for the Southern District of Mississippi

Charles's Fourth Motion for New Trial [226] centers on what he calls "new evidence . . . that links this case to the selective targeting of Charles Bolton for prosecution by Office [sic] of the Assistant [sic] United States Attorney for the Southern District of Mississippi and federal investigators within the Southern District of Mississippi."  (Charles's Fourth Motion for New Trial [226] at pp. 2-3.)   This "new evidence" is an internal Department of Justice memorandum dated July 29, 2015, "approv[ing] the recusal of the entire United States Attorney's Office for the Southern District of Mississippi from the investigation and potential prosecution of Charles Bolton . . . based upon existing conflicts of interests or the appearance of conflicts of interest."  (DOJ Memo. [226-1].)   Despite Charles's allegation that this was an "involuntarily" recusal, the language of this memorandum reads as if the Mississippi USAO requested recusal.[49] (Charles's Fourth Motion for New Trial [226] at p. 3.)   Furthermore, though Charles claims that this memorandum mandated that Agent Luker recuse himself from the tax investigation, the memorandum actually only relates to the Mississippi USAO, which is under the authority of the Department of Justice and which was not in any way involved in the tax case.  Agent Luker is an agent with the Internal Revenue Service, which is not under the authority of the Department of

---

[48] Charles did incorrectly file a motion for bond pending appeal with the Fifth Circuit, which has no authority to grant such a motion unless it is first considered by the district court.

[49] Though the Court does not know the reason behind this recusal, it suspects that it involves the Mississippi USAO's previous involvement in the food theft case against Defendants.

Justice,[50] and the Department of Justice would have had no authority to order his recusal even if this memorandum did call for it, which it does not.

### D. Prosecution's Failure to Follow Internal DOJ Regulations

Charles makes multiple arguments in his Fourth Motion for New Trial [226] that the Louisiana USAO did not follow internal Department of Justice Regulations, as described in the United States Attorneys Manual (the "USAM"), in bringing this case against him. Even if Charles were correct in these allegations, which the Court does not find, the Fifth Circuit has found that the USAM does not create any substantive or procedural rights for a criminal defendant. *United States v. Cooks*, 589 F.3d 173, 184 (5th Cir. 2009) (citations omitted). As such, all Charles's arguments to the contrary are meritless.

Because it does not provide any meritorious argument that Charles is entitled to a new trial under Rule 33(b), Charles's Fourth Motion for New Trial [226] will be **denied**.

## VII. LINDA'S FIRST MOTION FOR NEW TRIAL [178]

At the onset of its analysis of Linda's First Motion for New Trial [178], the Court would note that it appears to be in large part a copy of Charles's Second Motion for New Trial [177],[51] with large swaths of Charles's motion copied verbatim, changing only "he" to "she" and "Owen" to "McDuff," and in many places forgetting to make these required changes. Because of this duplication of the issues, the Court adopts its reasoning for denying Charles's motion to **deny** Linda's motion as to those issues, and addresses only those issues that are unique to her motion.

---

[50] The IRS is actually a bureau of the Department of the Treasury.
[51] This includes copying many of the lies and misrepresentations made in Charles's motion.

### A.    Conflict of Interest

#### 1.    Conflict Caused by Court's Disqualification

Linda argues that the Court caused an "attorney-to-attorney conflict of interest" by disqualifying Holmes and Dukes.  (Linda's First Motion for New Trial [178] at p. 4) (emphasis omitted).  The disqualification of Holmes and Dukes is not new evidence that entitles Linda to a new trial under Rule 33(b).  Also, the Court has already found that an "attorney-to-attorney conflict of interest" is not a recognized legal concept.[52]  *See supra* IV.D.  Furthermore, the Court was correct in disqualifying Holmes and Dukes.

"[T]he Sixth Amendment simply does not provide an inexorable right to representation by a criminal defendant's preferred lawyer."  *United States v. Hughey*, 147 F.3d 423, 428 (5th Cir. 1998) (citing *Wheat v. United States*, 486 U.S. 153, 159, 108 S. Ct. 1692, 100 L.Ed.2d 140 (1988)).  "The Sixth Amendment right to counsel of choice is limited, and protects only a paying defendant's fair or reasonable opportunity to obtain counsel of the defendant's choice."  *Id.* (citations omitted).  Furthermore, although "there is a presumption in favor of a defendant's counsel of choice, . . . that presumption may be overcome by an actual conflict of interest, or by showing a serious potential for conflict."  *United States v. Gharbi*, 510 F.3d 550, 553 (5th Cir. 2007) (citing *Wheat*, 486 U.S. at 164, 108 S. C.t. 1692).  The Court can think of no clearer example of "a serious potential conflict" than where a retained attorney is a potential witness against a criminal defendant.  *See id.*

#### 2.    Continuance After Disqualification

Linda also accuses the Court of wrongfully denying her a continuance after Holmes and Dukes were disqualified.  Again this is not new evidence.  This is not even a correct statement of

---

[52] The Court would also note that there was absolutely nothing preventing Defendants from agreeing to be represented by the same attorney, which would have alleviated any potential for disagreement among counsel.

the record.  The Court did in fact grant Linda a 21-day continuance to allow her new attorney more time to prepare after Holmes and Dukes were disqualified.  (*See* Order [45] at pp. 9-10.)

Because her arguments under this issue are completely baseless, the Court will **deny** Linda's First Motion for New Trial [178] on this issue.

### B.      Ineffective Assistance of McDuff

The only unique allegation of ineffective assistance of counsel Linda makes that is not a copy of Charles's motion is her contention that McDuff should have objected to the disqualification of Holmes and Dukes.  As Holmes and Dukes were disqualified on July 28, 2016, and McDuff did not enter his appearance until August 26, 2016, the Court is puzzled over how Linda proposes he should have objected when he had not even been hired by her at the time of disqualification.

For all the reasons stated in denying Charles's ineffective assistance of counsel claim, *see supra* IV.B, and because Linda's unique arguments have no merit, the Court will **deny** Linda's First Motion for New Trial [178] under this issue.

### C.      McDuff at Sentencing

The only unique claim against McDuff at sentencing that Linda claims entitles her to a new trial is the fact that he fainted during the sentencing hearing and resumed oral arguments after a recess, alleging that he was unconscious "for several minutes" and "medically unfit to continue." (Linda's First Motion for New Trial [178] at pp. 61-62.)  McDuff strenuously objects to this characterization of the incident.  He states that he "fainted at the podium" but "came to fairly quickly" and "ultimately made all of the arguments regarding the sentencing that [he] had intended to make."  (McDuff Response [279] at p. 20.)  McDuff's recitation of the incident comports with the Court's memory of the events, and the Court therefore does not find that Linda was in any way

impacted by McDuff's fainting at sentencing.  Her First Motion for New Trial [178] will be **denied** here as well.

## VIII.  LINDA'S SECOND MOTION FOR NEW TRIAL [231]

This motion of Linda's is based on the same arguments as Charles's Fourth Motion for New Trial [226] and is hereby **denied** for the same reasons.

## IX.  CHARLES'S REPLY TO OWEN'S RESPONSE [292]

In his Reply to Owen's Response [292], Charles makes various accusations concerning Owen's actions in connection with the Motions for New Trial [175][177][178][181][226][231] and asks for his response to be stricken.  Specifically, Charles claims that Owen went outside the scope of the waiver of the attorney-client privilege and made impermissible arguments against issues in Charles's motions which did not pertain to him.  The Court specifically ruled that there were no limits to the waiver of the attorney-client privilege and does not find any of the formerly-privileged information revealed by Owen to be irrelevant to the motions at issue.  (*See* Order [273] at p. 6.)  The Court expresses no opinion as to whether Owen had the right to make arguments as to any issue besides those dealing with ineffective assistance of counsel, except to note that Charles's motions are written in a confusing way that makes it difficult to tell which arguments are addressing ineffective assistance of counsel and to point out that none of Owen's actions in connection with these motions have any bearing on Charles's or Linda's rights to a new trial.  Furthermore, because the factual information in Owen's Response [276][277] is needed to fully address Charles's motions, the Court will not strike it.

## X.  CONCLUSION

IT IS THEREFORE ORDERED AND ADJUDGED that Charles's First Motion for New Trial [175] is **denied**.

IT IS FURTHER ORDERED AND ADJUDGED that Charles's Second Motion for New Trial [177] is **denied**.

IT IS FURTHER ORDERED AND ADJUDGED that Charles's Third Motion for New Trial [181] is **denied**.

IT IS FURTHER ORDERED AND ADJUDGED that Charles's Fourth Motion for New Trial [226] is **denied**.

IT IS FURTHER ORDERED AND ADJUDGED that Linda's First Motion for New Trial [178] is **denied**.

IT IS FURTHER ORDERED AND ADJUDGED that Linda's Second Motion for New Trial [231] is **denied**.

SO ORDERED AND ADJUDGED this the 3rd day of July, 2017.


*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE